UNITED STATES of America, Plaintiff,

v.

Ira Lee HILL, Jr., Robert Allen Johnson, Roy M. Lister, Pamela E. Wells, a/k/a Pamela Johnson, Ira Lee Hill, Sr., Wewahitchka State Bank, I & E Properties, Inc., Hill Properties, Inc., and Miracle Strip Boat and Motor Headquarters, Inc., Defendants.

No. MCA 84–2144–RV.

United States District Court,
N.D. Florida,
Panama City Division.

Nov. 12, 1987.

Samuel A. Alter, Asst. U.S. Atty., Pensacola, Fla. and Polly A. Dammann, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff.

Robert B. Staats, Staats, Overstreet & White, Panama City, Fla., for P.E. Wells.

Larry A. Bodiford, Hutto, Nabors & Bodiford, Panama City, Fla., for defendants Ira Lee Hill, Sr., Ira Leen Hill, Jr., I & E Properties, Inc., Roy M. Lister.

Lynn C. Higby, Panama City, Fla., for defendant Wewahitchka State Bank.

M. Kathryn Knight, Miller, Hamilton, Snider & Odom, Mobile, Ala., for defendant Employer Ins. of Wausau.

VINSON, District Judge.

## ORDER AND MEMORANDUM DECISION

On October 14, 1984, the United States filed this civil action seeking recovery for damages it sustained in connection with certain bank loans guaranteed by the Small Business Administration ("SBA") and the Farmers Home Administration ("FmHA"), two federal agencies authorized by Congress to guarantee loans made to businesses. The amended complaint (doc. 50) contains seven counts. Counts I through III arise under the False Claims Act, Title 31, *United States Code*, §§ 3729–31. Count I alleges that defendants Ira Lee Hill, Jr., Roy M. Lister, Robert Allen Johnson, Pamela E. Wells, Wewahitchka State Bank ("WSB") and I & E Properties, Inc. ("I & E Properties") conspired to defraud the United States by making or using false statements or documents in applications for federal loan guarantees. [31 U.S.C. § 3729(a)(3)] Counts II and III allege that these same defendants knowingly made or caused to be made false statements and documents for the purpose of inducing the SBA and the FmHA to guarantee loans for the purchase of two businesses. Under Counts I through III, the Government seeks to hold the defendants jointly and severally liable for triple the damages it sustained by satisfying its guarantees under the loans, as well as for forfeitures in the amount of $30,000.[1] Counts IV, V, and VI allege that WSB breached its loan guarantee agreements with the SBA and the FmHA by knowingly submitting or causing to be submitted false claims to the agencies. Finally, in Count VII, the Government seeks to set aside certain allegedly fraudulent conveyances made by Ira Lee Hill, Jr. and I & E Properties to Ira Lee Hill, Sr., Hill Properties, Inc., and Miracle Strip Boat and Motor Headquarters, Inc.

On June 27, 1986, the Government filed a motion for summary judgment against defendants Hill, Jr., Lister, WSB, and I & E Properties as to Counts I through VI of the amended complaint.[2] (Doc. 117) The Government's motion is based on the plead-

---

1. Counts I through III of the amended complaint originally sought double damages and $6,000 in forfeitures under the False Claims Act. The Act, however, was amended on October 27, 1986 [Pub.L. No. 99–562, § 2, 100 Stat. 3153 (1986)], altering the liability, damages, and *qui tam* provisions of the prior law. The effect of the 1986 amendments are discussed in detail in subsequent portions of this order.

2. Although defendants Johnson and Wells are named in Counts I through III, the motion does not refer to them. Since defaults have been entered against these two defendants [doc. 148], it is not necessary to consider Johnson and Wells for purposes of the summary judgment motion.

ings on file, the criminal convictions and subsequent judgments entered in this district against Hill, Jr., Lister, and Johnson [*see United States v. Johnson*, 730 F.2d 683 (11th Cir.1984)], the evidence and testimony admitted at that criminal trial, and voluminous documentary evidence. (Doc. 176) Essentially, the Government contends that the criminal convictions conclusively establish the facts necessary for liability under the False Claims Act and Rule 56, Federal Rules of Civil Procedure, and that WSB and I & E Properties are also civilly responsible on the basis of vicarious liability. The defendants, on the other hand, dispute the effect of collateral estoppel and, with regard to the corporate defendants, argue that mere vicarious liability is insufficient under the complex circumstances of this case. Thus, the defendants challenge the Government's motion on the basis that genuine disputes of material fact remain for trial.

## I. FACTUAL BACKGROUND

In accordance with my order dated March 30, 1987 (doc. 163), the parties submitted separate statements of material facts that they contend are or are not in dispute. (Docs. 166, 175) These statements reveal that the following facts are undisputed.

(A) *The federal programs.* The SBA and the FmHA are agencies of the United States responsible for administering the Small Business Act [3] and the Business and Industrial Loan Program,[4] respectively. Both agencies are authorized to guarantee loans made to businesses. While some differences exist in the applicable procedures, both agencies guarantee loans in a similar fashion. An individual or entity desiring to borrow money for specified purposes initiates the guarantee process by filing an application for the loan with a participating lender.[5] In order to obtain the federal guarantee, the applicant must generally meet certain criteria. For example, the regulations relating to the SBA at the time

stated that the applicant must be of "good character," that the applicant must have enough capital in the business to operate on a sound financial basis with SBA assistance, and that the loan must be reasonably secure to assure repayment. *See* 13 C.F.R. § 122.16 (1978). Additionally, the SBA application requires the lender to make an evaluation of the ability of the applicant's management, the applicant's repayment ability, and to furnish details regarding the applicant's or its officer's prior involvement in criminal proceedings. The lender must also report the applicant's or its affiliates' current indebtedness to the lender. The FmHA imposes similar requirements. *See, e.g.,* 7 C.F.R. § 1980.441 (1978). If the loan and guarantee application is approved, the agency issues an authorization agreement containing certain conditions which must be met before the lender disburses the funds. Under the guarantee, the agency agrees to purchase a guaranteed percentage of the outstanding loan balance in the event of default. Under the guarantee agreements, the agencies retain the right to seek recovery against the lender for various reasons. 13 C.F.R. § 122.10(a)(6) (1978); 7 C.F.R. § 1980.11 (1978). Both guarantee programs allow the lender to assign the guarantee to a secondary participant by entering into an agreement with the agency and the assignee. The agencies, however, retain rights of recourse against the lender as defined in the assignments.

(B) *The loans.* The Government seeks relief based on three loan transactions involving various defendants and WSB. Each of these transactions formed the basis for the prior criminal convictions of Hill, Jr., Lister, and Johnson and are described briefly here.

(1) *Big Chief Truck Stop Loan.* On or about August 7, 1978, WSB, through its president, defendant Roy M. Lister, submitted an application to the SBA to guarantee 90% of a $195,000 loan. The purpose of the loan was to enable William J. Dasinger

---

**3.** 15 U.S.C. § 631 *et seq.*

**4.** *See* 7 C.F.R. § 1980.401 *et seq.*

**5.** The FmHA offers a "preapplication" process to determine whether a project will be eligible and economically feasible. (Doc. 166 at 6, ¶ 17)

to purchase a business called "Big Chief Truck Stop" from defendant I & E Properties, a Florida corporation.[6] Defendant Hill, Jr. was, at all times relevant to this case, the president of I & E Properties. The application and documents submitted by WSB represented that Dasinger had made a $10,000 deposit toward the purchase of the business. On August 23, 1978, SBA approved the application, and WSB then disbursed the loan proceeds jointly to Dasinger and I & E Properties. The same day that WSB disbursed the Big Chief Truck Stop loan proceeds, Hill, Jr. issued checks to Dasinger and another individual, Jimmy D. Reavis. These checks were used to reduce or pay off unsecured loans that Dasinger and Reavis had received from WSB.

(2) *Florida Trailer Sales Loan.* The second guarantee also involved the SBA. On or about January 16, 1979, defendants WSB, Lister, Hill, Jr., I & E Properties, and Johnson submitted or caused the submission of an application to the SBA requesting that the agency guarantee a $350,000 loan by WSB to Johnson. Johnson intended to use the proceeds to purchase Florida Trailer Sales of Panama City, Inc. from I & E Properties.[7] The application and documents submitted contained the following representations: (a) the statement of personal history represented that Johnson had never been convicted of a criminal offense other than a minor traffic violation; (b) the application and a personal financial statement of Johnson represented his net worth as $83,000; and (c) a contract for sale between Johnson and I & E Properties represented that Johnson had made a $50,000 down payment toward the purchase of Florida Trailer Sales.

On March 7, 1979, the SBA approved WSB's request for a 90% guarantee of the loan and issued an Authorization and Loan Agreement requiring, *inter alia,* that the borrower furnish evidence prior to disbursement that an initial equity injection of $60,000 had been made to the business since December 31, 1978. On March 15, 1979, WSB certified in a settlement sheet that the proceeds of the loan had been disbursed in accordance with the Authorization and Loan Agreement. The bank also certified that it received no direct or indirect benefit in connection with making the loan. On that same day, Hill, Jr. wrote a check to WSB in the amount of $75,246.58, which was the balance due on a portion of a "floor planning" agreement between WSB, Hill, Jr., and Capital City First National Bank.

Approximately one month later, WSB entered into a secondary participation guarantee agreement and sold the guaranteed portion of the loan ($315,000) to a secondary purchaser. By letter dated November 8, 1979, the secondary purchaser made a formal demand on the SBA to repurchase the guaranteed portion of the loan after WSB stated that it was not in a position to do so. On or about January 21, 1980, the SBA paid $331,865.21 to the secondary purchaser. In March 1981, the SBA liquidated Florida Trailer Sales and received a net recovery of $72,465.75. The SBA incurred expenses of $3,621.88 in connection with the liquidation. The SBA claims a total loss of $262,841.44 in connection with the loan.

(3) *Eastgate Mobile Home Park Loan.* The third loan underlying the government's claims was made by WSB to Pamela E. Wells, d/b/a Eastgate Mobile Home Park and Sales, Inc., for the purchase of Eastgate Mobile Home Park ("Eastgate").[8] On or about August 27, 1978, defendant Wells, Johnson, Hill, Jr., I & E Properties, Lister, and WSB submitted or caused the submission of a "pre-application" to the FmHA to

---

6. This loan guarantee appears to relate to the allegations in Count I of the amended complaint alleging a conspiracy under the False Claims Act. The Big Chief Truck Stop loan also forms the basis of Count VI of the amended complaint, in which the Government apparently seeks a release from the guarantee, or a recision of the contract.

7. The Florida Trailer Sales loan guarantee relates to the allegations in Count I as well as the allegations in Counts II and IV.

8. The third loan guarantee is the basis of the conspiracy allegations in Count I, as well as the allegations in Counts III and V.

obtain a guarantee. The pre-application and documents submitted contained the following representations: (a) the pre-application stated that Wells would contribute $40,000 toward the purchase price of Eastgate; and (b) a personal financial statement of Wells dated August 31, 1978, stated that her financial assets exceeded her liabilities by $126,800.

On October 5, 1978, the FmHA discouraged Wells from completing a full application on the basis that her proposed start-up equity was too thin and that her financial resources and management experience were insufficient. In order to assuage the FmHA, Hill, Jr. agreed to guarantee the loan to Eastgate, advance working capital to Wells, and work with Wells in the areas of the mobile home business in which she lacked experience. Hill, Jr. also submitted a personal financial statement to the FmHA, which stated that his net worth was $3.3 million. The FmHA then determined that a full application could be submitted.

On January 16, 1979, WSB, Wells, Hill, Jr., Johnson, Lister, and I & E Properties submitted or caused the submission of an application for a loan and guarantee to the FmHA. The application and the accompanying documents contained the following representations: (a) the application and a personal financial statement dated December 31, 1978, stated that Wells' net worth was $128,450; (b) a contract for sale of Eastgate dated July 12, 1978, stated that the purchase price was $400,000 and that Wells had made a $5,000 deposit held in escrow. The contract also stated that Wells would pay an additional $35,000 at closing; and (c) copies of receipts showed that John W. Whited, a realtor, received $5,000 from Wells on July 11, 1978, and that Hill, Jr., received $35,000 from Wells on July 17, 1978, for the balance of the down payment.

On April 19, 1979, the FmHA approved WSB's application for the guarantee on the proposed loan to Eastgate, subject to certain conditions set forth in the Conditional Commitment for Guarantee. Among the conditions were: (a) a $60,000 cash contri-

bution by the borrower; and (b) a requirement that any debt represented by funds forwarded by Hill, Jr. be immediately subordinated. The Conditional Commitment further provided that the guarantee would issue after the FmHA was advised by WSB that the conditions had been met. On May 23, 1979, WSB and Wells signed the conditional agreement for guarantee representing that they accepted the conditions. On the same day, the FmHA executed the loan note guarantee and the lender's agreement. Also on May 23, 1979, Hill, Jr. issued two checks to WSB paying off the balance of the I & E Properties floor planning agreement and paying off the balance of a loan made by WSB to Nick Mason, Hill, Jr.'s certified public accountant, who eventually testified against Hill, Jr., Lister, and Johnson at the criminal trial.

On May 23, 1979, the FmHA signed an Assignment Guarantee Agreement permitting WSB to assign the guaranteed portion of the Eastgate loan to a secondary purchaser. An assignment was effectuated, and on February 25, 1980, following default, the secondary purchaser made a demand for payment on the FmHA. The FmHA then issued a check to the secondary purchaser in the amount of $348,-949.15. The FmHA received $11,561.51 following the sale of Wells' home and $257,-869.94 following the sale of Eastgate. The FmHA claims a net loss of $79,517.70 in connection with its guarantee of the Eastgate loan.

(C) *The criminal convictions.* On March 10, 1982, defendants Hill, Jr., Johnson, and Lister were indicted in the Northern District of Florida. The indictment charged the defendants with one count of conspiracy to submit false statements to a federal agency in violation of Title 18, *United States Code,* Section 371, and with eleven counts of submitting false statements to federal agencies in violation of Title 18, *United States Code,* Section 1001. The indictment stated that the substantive violations each constituted overt acts necessary for conviction of a conspiracy under Section 371.

On October 6, 1982, the jury found all three defendants guilty of conspiracy. Additionally, Hill, Jr. was convicted of eight of the eleven counts of submitting false statements and documents, Johnson was convicted of five counts, and Lister of four. Hill, Jr.'s convictions on the substantive counts related to false statements concerning the loans to Big Chief Truck Stop, Florida Trailer Sales, and Eastgate. Johnson's convictions related to the Florida Trailer Sales loan and the Eastgate loan. Defendant Lister's only substantive conviction relevant to this case related to the Florida Trailer Sales loan.[9] The conspiracy convictions were based on each of the three loan guarantees.

## II. APPLICABILITY OF 1986 AMENDMENTS TO THE FALSE CLAIMS ACT

During the pendency of the Government's motion for summary judgment, the False Claims Act was amended by the "False Claims Amendments Act of 1986," Pub.L. No. 99–562, § 2, 100 Stat. 3153 (codified as amended at 31 U.S.C. §§ 3729–33) (1986). The general purposes of the amendments were to correct restrictive judicial interpretations of the Act's liability standard, the burden of proof, and jurisdiction of *qui tam*, or public informer, actions. S.Rep. No. 99–345, 99th Cong., 2d Sess. 3–4, *reprinted in* 1986 U.S.Code Cong. & Ad.News 5266, 5267–69:

> The False Claims [Amendments] Act [of 1986] ... modernizes jurisdiction and venue provisions, increases recoverable damages, raises civil forfeiture and criminal penalties, defines the mental element required for a successful prosecution and clarifies the burden of proof in civil false claims actions.

> S.Rep. No. 99–345, *supra*, at 2, 1986 U.S.Code Cong. & Ad.News 5267.

In essence, Congress intended the amendments to provide the Government with "a more useful tool against fraud in modern times," and "to encourage any individual knowing of Government fraud to bring that information forward." S.Rep. No. 99–345, *supra*, at 2, 1986 U.S.Code Cong. & Ad. News 5267.

The Government argues that the 1986 amendments should be applied retroactively to the defendants' conduct in this case. The defendants predictably disagree and contend that the 1986 amendments should apply prospectively only. The practical consequences of the resolution of this seemingly simple, yet esoteric, issue are made abundantly clear in this case, both in terms of the ultimate outcome of the case and in terms of my consideration of the Government's motion for summary judgment. Under the former Act, a defendant found liable was required to pay double the damages incurred by the United States because of the defendant's conduct, in addition to a forfeiture of $2,000 for each violation of the Act. The 1986 amendments, however, require the payment of treble damages [10] and the forfeiture of not less than $5,000 and not more than $10,000 for each violation of the Act. Additionally, for the first time in the Act's history, the 1986 amendments provide definitions of the terms "knowing" and "knowingly" and expressly state that "no proof of specific intent to defraud is required." [31 U.S.C. § 3729(b)] Whether this description of the standard of liability is viewed as a "clarification" or as an outright change in the law, it is clear that the 1986 amendments affect the cases in this circuit, which had held that an intent to deceive or defraud the Government is a discrete element of False Claims Act liability.[11] *See United States v. Davis*, 809 F.2d 1509, 1512 (11th Cir.1987); *United States v. Aerodex, Inc.*, 469 F.2d

---

**9.** Lister and Hill, Jr. were also convicted on Counts VI, VII, and VIII of the indictment. Those counts related to a loan application made to the SBA in connection with an attempted purchase by Hill, Jr. of Florida Trailer Sales. This loan guarantee, however, was never approved by the SBA, and is not alleged as the basis of the Government's amended complaint.

**10.** There are limited exceptions to the treble damages provision, which do not apply here. *See* 31 U.S.C. § 3729(a)(1)–(7)(A)–(C).

**11.** The effect of the 1986 amendments to the standard of liability is discussed later in this order.

1003 (5th Cir.1972). *But see United States v. Hughes,* 585 F.2d 284 (7th Cir.1978); *United States v. Cooperative Grain & Supply Co.,* 476 F.2d 47 (8th Cir.1973). Accordingly, in order to resolve the first question presented, it is necessary to examine the 1986 amendments to the False Claims Act in an attempt at ascertaining the often elusive intent of Congress. *See* Llewellyn, *Remarks on the Theory of Appellate Decisions and the Rules or Canons about How Statutes are to be Construed,* 3 Vand.L.Rev. 395, 401–06 (1950).

The decision in *Bradley v. School Board of City of Richmond,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), provides the point of departure for determining whether the 1986 amendments to the False Claims Act apply in this case. In *Bradley,* which was a protracted school desegregation case, the plaintiffs filed a motion for attorney's fees in the district court. In the exercise of its equitable powers, the district court awarded fees in the amount of $43,-355 for legal services rendered from March 10, 1970, through January 29, 1971. The school board appealed the attorney's fee award to the Fourth Circuit. While that appeal was pending, Congress enacted Section 718 of the Emergency School Aid Act [20 U.S.C. § 1617] as part of the Education Amendments of 1972, Pub.L. No. 92–318, 86 Stat. 235, 369. This statute grants authority to a federal court to award a reasonable attorney's fee to a prevailing party in a school desegregation case upon the entry of a final order. The Fourth Circuit, sitting en banc, reversed the district court's award of attorney's fees on the grounds that (1) in the absence of an appropriate statute, an award of fees was not justified, and (2) Section 718 was not applicable because there were no district court orders pending or appealable on May 26, 1971, when the lower court awarded fees, or on July 1, 1972, when Section 718 became effective. *Bradley v. School Board of City of Richmond,* 472 F.2d 318 (4th Cir.1972) (en banc).

On certiorari, the Supreme Court of the United States vacated the judgment of the Court of Appeals and remanded the case. The Court, in a unanimous opinion by Justice Blackmun, held that the application of a new law during the pendency of an appeal is controlled by the "principle that a court is to apply the law in effect at the time it renders its decision, unless doing so would result in a manifest injustice or there is statutory direction or legislative history to the contrary." *Bradley,* 416 U.S. at 711, 94 S.Ct. at 2016. This rule of statutory construction applies equally in cases involving changes in law prior to a district court's determination of an issue. *See Campbell v. United States,* 809 F.2d 563, 569 (9th Cir.1987); *In re Reynolds,* 726 F.2d 1420, 1422 (9th Cir.1984); *Bell v. New Jersey,* 461 U.S. 773, 793, 103 S.Ct. 2187, 2198, 76 L.Ed.2d 312 (1983) (White, J., concurring). Thus, in order to determine whether the 1986 amendments are retroactive, I must look toward the statute itself, its legislative history, and to whether a "manifest injustice" would result in this case should I determine to apply the amendments retroactively.

■ (A) *Statutory direction or legislative history.* The 1986 amendments to the False Claims Act were signed into law by the President on October 27, 1986. Nowhere in the enactment, however, does Congress address the issue of whether the amendments are to be applied retroactively or prospectively. Thus, the language of the statute does not rebut the *Bradley* presumption of immediate application.

■ The presumption of retroactivity articulated by the Supreme Court in *Bradley* may also be displaced by a "fair indication that the statute, properly construed, has only prospective effect...." *Litton Systems, Inc. v. American Telephone & Telegraph Co.,* 746 F.2d 168, 174 (2d Cir. 1984); *Campbell v. United States, supra,* 809 F.2d at 572; *Brooks v. United States,* 757 F.2d 734, 742 (5th Cir.1985); *Louis Vuitton, S.A. v. Spencer Handbags Corp.,* 597 F.Supp. 1186, 1193 (E.D.N.Y.1984), *aff'd,* 765 F.2d 966 (2d Cir.1985). A "fair indication" of prospectivity may be supported by legislative history. But if the legislative history could support prospectivity or retroactivity, the *Bradley* presump-

tion should control.[12] *Bradley, supra,* 416 U.S. at 715–16, 94 S.Ct. at 2018.

Having exhaustively examined the available legislative history, it is apparent to me that Congress never expressly considered whether the 1986 amendments should apply prospectively or retroactively. However, consideration of the basic purposes of the amendments might suggest congressional intent to apply the amendments prospectively only, thereby displacing the *Bradley* presumption. *See United States v. Angiulo,* 755 F.2d 969, 971 (1st Cir.1985); *Louis Vuitton, S.A. v. Spencer Handbags Corp., supra,* 597 F.Supp. at 1193, *approved on appeal,* 765 F.2d at 972 n. 2. Put somewhat differently, if the purposes of the amendments would be furthered *only* by prospective application, it is reasonable to assume that Congress did not intend for the amendments to apply retroactively.

The 1986 amendments appear to be directed toward three principal objectives, each of which is addressed through an express addition to the Act. First, the amendments seek to deter Government fraud through the imposition of substantial forfeitures and treble damages. [31 U.S.C. § 3729(a); 132 Cong.Rec. H6479 (daily ed. Sept. 9, 1986) (statement of Rep. Glickman); *id.* at H6480 (statement of Rep. Fish). Retroactive application of the heightened civil penalties and damages cannot serve the purpose of *specific* deterrence (*i.e.,* deter-

rence of the individual defendants now before the court), since the specific conduct which has already taken place can no longer be deterred. While general deterrence (*i.e.,* deterrence of others through the application of a law to an individual) may be furthered by either retroactive or prospective relief, I am doubtful that retroactive application would have any practical effect. But I cannot say that it would have no effect. Therefore, in my view, the congressional purpose of deterrence is not furthered by *only* prospective application, and it is not a basis for rejecting the *Bradley* presumption.

Second, the 1986 amendments, through the *qui tam* provisions, are intended to enhance private citizen assistance in curbing government fraud. 31 U.S.C. § 3730(b); 132 Cong.Rec. S11243 (daily ed. Aug. 11, 1986) (statement of Sen. Grassley); 132 Cong.Rec. H6482 (daily ed. Sept. 9, 1986) (statement of Rep. Glickman). This purpose would be furthered to some degree by retroactive application of the 1986 amendments. In view of the rather lengthy statute of limitations found in the amendments [31 U.S.C. § 3731], it is feasible that a *qui tam* plaintiff will come forward, because of the amendments to the *qui tam* provisions, to expose conduct which occurred prior to the enactment of the amendments. Thus, the purpose of

12. The Government contends that I need not resort to the *Bradley* presumption, since Congress unequivocally intended that the 1986 amendments be applied retroactively. Specifically, the Government notes that the 99th Congress passed three other statutes dealing with government fraud, each specifically providing for prospective application only. *See* "Program Fraud Civil Remedies Act of 1986," Pub.L. No. 99–509, Title VI, §§ 6101–04, Oct. 21, 1986, 100 Stat. 1934; "Anti-Kickback Act of 1986," Pub.L. No. 99–634, § 3, Nov. 7, 1986, 100 Stat. 3523; "Department of Defense Authorization Act of 1986," Pub.L. No. 99–145, Nov. 8, 1985, 99 Stat. 583. These Acts, along with the 1986 amendments to the False Claims Act, were passed within a short period of one another, and the legislative history reveals that the drafters of the 1986 amendments were aware of certain provisions in the other statutes. *See* S.Rep. No. 99–345, *supra,* at 17, 20–21. Since Congress expressly stated that these three similar enact-

ments were to apply prospectively only, the Government argues that the omission of such language from the 1986 amendments represents a clear intent that the amendments apply both retroactively and prospectively. I cannot accept this, however, as a basis of clear and unequivocal congressional intent. While the Government's conclusion as to intent is plausible, it is equally likely that Congress had actually intended to insert a prospectivity clause in the 1986 amendments in light of the fact that one had been included in three similar enactments, but had failed to do so through nothing more than mere inadvertence. Inferring a "clear" intent through congressional silence is not a sound interpretive policy, and I decline to do so. *Cf. Johnson v. Transportation Agency, Santa Clara County, California,* — U.S. —, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987) (Scalia, J., dissenting) (gleaning congressional intent from a failure to act is a "canard").

enhancing citizen suits would be furthered by retroactive application.

Third, the amendments are intended to expressly define the standard of liability required under the Act in order to further the Act's remedial purposes. 31 U.S.C. § 3729(b); 132 Cong.Rec. S11243–44 (daily ed. Aug. 11, 1986) (statement of Sen. Grassley); 132 Cong.Rec. H6480 (daily ed. Sept. 9, 1986) (statement of Rep. Fish); Sen.Rep. No. 99–345, *supra*, at 6–7. In particular, Congress objected to the restrictive interpretations some appellate courts, including panels of this circuit and the former Fifth Circuit, had given to the simple phrase "knowingly presents, or causes to be presented ... a false or fraudulent claim for payment or approval," which forms the basis for most suits under the False Claims Act. [31 U.S.C. § 3729(1), amended and codified at 31 U.S.C. § 3729(a)(1)] *See United States v. Davis, supra,* 809 F.2d at 1512 (requiring specific intent to deceive government); *United States v. Aerodex, Inc., supra,* 469 F.2d at 1006–07 (same); *United States v. Mead,* 426 F.2d 118 (9th Cir.1970) (same); Sen. Rep. No. 99–345, *supra,* at 6–7. Congress' purpose of providing a more "uniform" and "appropriate" standard for civil, remedial actions would be furthered by applying the amendments both prospectively and retroactively. Application of the 1986 amendments to all pending cases would further the remedial purpose.

A careful analysis of the purposes of the 1986 amendments, therefore, in the context of whether they would be furthered *only* by prospective application, does not reveal a congressional intent to limit the effect of the amendments only to conduct occurring after the date of the amendment's enactment. Similarly, there is nothing in the language of the amendments themselves which would evince a restrictive legislative intent. Accordingly, the *Bradley* presumption is not affected by either a statutory directive or by a "fair indication" of congressional purpose or intent.

(B) *Manifest injustice.* Even in the absence of statutory direction or legislative history, retroactive application of a newly-enacted statute may yet be prohibited where retroactivity would result in a "manifest injustice." *Bradley, supra,* 416 U.S. at 711, 94 S.Ct. at 2016. By itself, the phrase "manifest injustice" provides little guidance to a court presented with difficult issues of whether a newly enacted law should apply to the case before it. *Bradley* sets out three factors by which the presence or absence of manifest injustice may be evaluated: "(a) the nature and identity of the parties, (b) the nature of their rights, and (c) the nature of the impact on the change in law upon those rights." *Bradley, supra,* 416 U.S. at 717, 94 S.Ct. at 2019. It is implicit that no one *Bradley* factor is entirely dispositive. *See City of Great Falls v. United States Department of Labor,* 673 F.2d 1065, 1068 (9th Cir.1982) (per curiam). In the final analysis, however, the three *Bradley* factors serve merely to focus the underlying concern in applying a law retroactively; i.e., whether the "disappointment of private expectations caused by retroactive application will outweigh the public interest in enforcement of the new rule." *Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 805 F.2d 1074, 1084 (1st Cir.1986); *New England Power Co. v. United States,* 693 F.2d 239, 245 (1st Cir.1982) (relying on *Bradley* ).[13]

The first *Bradley* factor focuses on the nature of the parties involved. *Bradley, supra,* 416 U.S. at 717–18, 94 S.Ct. at 2019–20. This factor is founded in Chief Justice Marshall's analysis that

in mere private cases between individuals, a court will and ought to struggle hard against a construction which will, by retrospective operation, affect the rights of parties, but in great national concerns, where individual rights ... are sacrificed for national purposes, ... the

---

**13.** The United States Court of Appeals for the First Circuit appears to be the only circuit expressly recognizing this balancing analysis. By candidly recognizing that the *Bradley* factors are no more than a means to a result and that the result is essentially bottomed in a balancing of private and public interests, the balancing analysis avoids any undue emphasis upon a single *Bradley* factor.

court must decide according to existing laws.

> *United States v. The Schooner Peggy,* 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49 (1801).

*See also Bradley, supra,* 416 U.S. at 717, 94 S.Ct. at 2019. As stated by the Eleventh Circuit in *United States v. Marengo County Commission,* 731 F.2d 1546, 1554 (11th Cir.1984), "[a]lthough it may not be imperative to apply new congressional enactments to preexisting disputes over private issues, when the new statute manifests important public policy, courts must respect that policy and apply it."

The 1986 amendments to the False Claims Act evince a clear effort by Congress to address a paramount national concern. According to some estimates, billions of dollars in public funds are lost annually through government fraud. S.Rep. No. 99–345, *supra,* at 3. Government fraud also "erodes public confidence in the Government's ability to efficiently and effectively manage its programs" [*id.*], and may, at times, pose a serious threat to human life, such as when a contractor fraudulently provides defective goods. *Id.* Thus, because this case involves issues beyond those affecting only private parties, and in view of the national concern in preventing and remedying government fraud, the first *Bradley* factor weighs heavily in favor of retroactive application of the 1986 amendments.[14]

The second *Bradley* factor requires an inquiry into the nature of the rights asserted by the parties. More specifically, retroactive application of a new enactment might yield a manifest injustice where retroactivity would "infringe upon or deprive a person of a right that had matured or become unconditional." *Bradley, supra,* 416 U.S. at 720, 94 S.Ct. at 2020. In the context of the facts here, this factor also favors retroactive application of the 1986

amendments. It cannot be said that the defendants have a "matured" or "unconditional" right to double, rather than treble damages, or to a $2,000 forfeiture, rather than a forfeiture ranging from $5,000 to $10,000. *See, O'Hare v. General Marine Transport Corp.,* 740 F.2d 160, 170–72 (2d Cir.1984) (amendments that change remedial scheme by imposing attorney's fees, award of interest, double interest payments or liquidated damages do not result in manifest injustice where conduct was previously subject to federal liability). Nor is it plausible to contend that the defendants had a "vested right" in any particular standard of liability.[15]

This case differs from *Bennett v. New Jersey,* 470 U.S. 632, 105 S.Ct. 1555, 84 L.Ed.2d 572 (1985), a case which the defendants contend has severely restricted the *Bradley* presumption. In *Bennett,* the question presented was whether the substantive provisions of the 1978 amendments to Title I of the Elementary and Secondary Education Act [20 U.S.C. § 2701 *et seq.*] apply retroactively in determining whether Title I funds were misused by New Jersey during the years 1970–72. The Supreme Court noted that the effect of Title I, like many other grant programs, is in the nature of a contract. *Bennett, supra,* 470 U.S. at 632, 105 S.Ct. at 1555. By choosing to participate in the program, the state "freely gave its assurances that it would abide by the [program's] conditions." *Id.* at 638–39, 105 S.Ct. at 1559 (quoting *Bell v. New Jersey,* 461 U.S. 773, 790, 103 S.Ct. 2187, 2197, 76 L.Ed.2d 312 (1983)). As a correlative to the state's assurances that the funds would be spent properly, the federal government had a "pre-existing right" to recover improperly used funds based on the law in effect at the time the funds were disbursed. *Bennett, supra,* 470 U.S. at 639, 105 S.Ct. at 1560. Consequently, the court held that the *Bradley*

---

14. In terms of balancing private and public interests, the national concerns in preventing and redressing government fraud clearly outweigh any arguable expectations of the defendants that the False Claims Act would remain unchanged. *See Marengo County Commission, supra,* 731 F.2d at 1554.

15. An analysis of whether the elimination of the "specific intent to defraud" requirement leads to a manifest injustice if applied retroactively is more appropriate under the third *Bradley* factor discussed post at 1170–1171.

presumption regarding retroactivity was effectively rebutted since the Government possessed a right of recovery that "had matured or [had] become unconditional." *Id.* (quoting *Bradley, supra,* 416 U.S. at 720, 94 S.Ct. at 2020).[16] Thus, I do not read *Bennett* as severely restricting the *Bradley* presumption. To the contrary, *Bennett* appears to be nothing more than an application of *Bradley* to facts which, upon analysis by the Court, displaced *Bradley's* presumption of retroactivity.[17]

The third *Bradley* factor requires an analysis of the nature of the impact that the change in the law has upon existing rights and obligations. *Bradley, supra,* 416 U.S. at 720, 94 S.Ct. at 2020–21. This consideration "stems from the possibility that new and unanticipated obligations may be imposed upon a party without notice or an opportunity to be heard." *Id.; see also id.* at 721, 94 S.Ct. at 2021 (noting "additional or unforeseeable obligations"). If the new statutory obligations would have caused the defendant to alter its conduct had it known of its obligations, a court is more likely to find manifest injustice in applying the new law retroactively. *Id.* Again, this factor weighs against the defendants. First, the 1986 amendments of the damages and forfeiture provisions do not prohibit something that was previously lawful. The deletion of the "specific intent to defraud" requirement now brings less culpable conduct within the ambit of the

law,[18] and it may be construed as imposing an "unanticipated obligation" upon the defendants. But it strains credulity to believe that had Hill, Jr., Johnson, and Lister known of the amendments, they would not have submitted false statements to the SBA or the FmHA. To entertain this assumption would be to conclude that the defendants, who undisputably engaged in criminal conduct, would have done otherwise had they known that they could be held civilly liable without a showing of specific intent to defraud. In fact, without a plausible suggestion of likely significant and justified reliance on the prior law, a party cannot avail itself of the third *Bradley* factor, and also falls outside the scope of other canons of statutory construction that may disfavor retroactivity. *See, e.g., Downs v. Director Office of Workers Compensation Programs, United States Department of Labor,* 803 F.2d 193, 198 (5th Cir.1986); *United States v. Anguilo,* 755 F.2d 969, 971 (1st Cir.1985); *Louviere v. Marathon Oil Co.,* 755 F.2d 428, 430 (5th Cir.1985). Here, the defendants do not offer *any* suggestion of likely reliance on the law in this circuit relating to the standard of liability under the False Claims Act, plausible or otherwise. Hence, an analysis of the third *Bradley* factor reveals no manifest injustice in applying the 1986 amendments retroactively.

In a final effort to avoid retroactive application of the 1986 amendments, the de-

---

**16.** The court also noted that the second factor in *Bradley, i.e.,* the nature of the parties' rights, is consistent with "another venerable rule of statutory interpretation, *i.e.,* that statutes affecting substantive rights and liabilities are presumed to have only prospective effect." *Bennett, supra,* at 639, 105 S.Ct. at 1560 (citing *United States v. Security Industrial Bank,* 459 U.S. 70, 79, 103 S.Ct. 407, 413, 74 L.Ed.2d 235 (1982)).

**17.** The Court in *Bennett* also relied on "practical considerations" relating to the administration of federal grant programs to support its position that "expenditures must presumptively be evaluated by the law in effect when the grants were made." *Bennett, supra,* 470 U.S. at 640, 105 S.Ct. at 1560. The Court was especially concerned that retroactivity would require new audits in response to every statutory change that occurred while review was pending. *Id.* There are no such "practical considerations" involved here.

**18.** This assumes that there is a distinction between "knowingly" filing a false or fraudulent statement and filing such a statement with the "specific intent to defraud." I fully recognize that the Eleventh Circuit requires the Government to prove specific intent to defraud [*United States v. Davis, supra,* 809 F.2d at 1512], but the case upon which the court relied appears to state that that element is an alternative to demonstrating knowledge; i.e., "knowingly:"

> The law is settled in this circuit that to show a violation of the False Claims Act the evidence must demonstrate "guilty knowledge of a purpose on the part of [the defendant] to cheat the Government," *United States v. Priola,* 272 F.2d 589, 594 (5th Cir.1959), *or* "knowledge *or* guilty intent," *United States v. Ridglea State Bank,* 357 F.2d 495, 498 (5th Cir.1966).

*United States v. Aerodex, Inc., supra,* 469 F.2d at 1007.

fendants rely on *Griffon v. United States Department of Health and Human Services*, 802 F.2d 146 (5th Cir.1986). In *Griffon*, the defendant was fined $44,000 under the Civil Monetary Penalties Law ("CMPL") [42 U.S.C. § 1320a–7a] for submitting twenty-two false claims to the Louisiana Medicaid Program in 1979. The CMPL was not enacted until 1981. The CMPL empowers the Secretary of HHS to implement and enforce the law, which provides that an individual is liable if he presents or causes to be presented a Medicaid or Medicare claim that the individual knew or had reason to know was not provided by statute or regulation. *Id.*, 802 F.2d at 149 n. 6. Recognizing that this standard of liability differed from the standard then existing under the False Claims Act, the Secretary promulgated regulations permitting retroactive application of the CMPL *only* to conduct that would have violated the False Claims Act at the time. *Id.* at 150–51.

On appeal, the question presented was whether the Secretary exceeded her authority by applying the CMPL retroactively to the defendant. The Secretary argued that the CMPL was procedural and remedial in nature and, because of her regulations which adopted the standard of liability under the False Claims Act to conduct occurring before enactment of the CMPL, the penalties should be upheld. The court disagreed, however, and found that the liability provisions of the statute involving the "knew or had reason to know" standard were substantive. *Id.*, 802 F.2d at 154. The court then invoked the canon of construction that statutes affecting substantive rights are to be applied prospectively only [*see, e.g., Union Pacific Railroad Co. v. Laramie Stock Yards Co.*, 231 U.S. 190, 34 S.Ct. 101, 58 L.Ed. 179 (1913)] and held that the new standard of liability so colored the nature of the entire CMPL that the law

as a whole could not be applied retroactively to the defendant's false claims. *Griffon, supra*, 802 F.2d at 155.

I find that *Griffon*, while supporting the defendants' position at first blush, is not applicable to the facts of this case. First, the court in *Griffon* found that the "knew or had reason to know" standard differed significantly from the standard of liability under the False Claims Act. I agree. Thus, a plausible argument could be made that, had one known of the far less onerous standard of liability under the CMPL, one could take greater care to avoid "reason to know" liability. *Id.*, 802 F.2d at 154. By contrast, the 1986 amendments to the False Claims Act did not work such a substantial change in the standard of liability to justify a conclusion that a defendant would have altered his conduct had he known of the amendments.[19] Here, it is highly unlikely that the defendants would have altered "knowingly fraudulent" conduct had they known that the Government would not be required to prove specific intent to defraud.

Second, and perhaps most persuasive, the court in *Griffon* did not cite or address the *Bradley* factors in its determination of whether retroactive application of the CMPL would result in a manifest injustice. To be sure, the court did state that the retroactive application of the relaxed standard of liability under the CMPL "*could affect vested rights and result in manifest injustice.*" *Id.*, 802 F.2d at 154. The court also recognized that, in light of the Secretary's regulation incorporating the False Claims Act's liability standards for all Medicaid fraud prior to enactment of the CMPL, no "manifest unfairness" resulted to the defendant in that case. *Id.*, 802 F.2d at 153 n. 14. Nevertheless, because a manifest injustice could occur to some hypothetical defendant,[20] the court denied retro-

**19.** The defendants seem to believe that the 1986 amendments to the False Claims Act also incorporated a "knew or had reason to know standard," thus supporting their position that *Griffon* compels my applying the amendments prospectively only. Although a *former* senate bill did incorporate a "knew or had reason to know" standard [S.Rep. No. 99–345, *supra*, at 20, 1986 U.S.Code Cong. & Ad.News 5285], the final version of the bill did not incorporate such a standard. *See* 31 U.S.C. § 3729(b).

**20.** It is difficult to understand this conclusion in light of the Secretary's regulation permitting liability only under the more rigorous standard of the False Claims Act.

active application. This result ignores the *Bradley* analysis, which requires a court to apply the three factors *to the parties before it.* The *Griffon* court's failure to even mention *Bradley* makes me hesitant to rely on the court's analysis or outcome.

■ In sum, I find that the application of the 1986 amendments to the False Claims Act to this case does not result in a manifest injustice. I arrive at this conclusion after carefully considering the *Bradley* factors and after recognizing that, to the extent that the defendants may contend that they relied on the provisions of the False Claims Act prior to its amendment, such reliance is not plausible and is substantially outweighed by the national concern in immediate application of the amendments.[21] Thus, under the 1986 amendments, the defendants are exposed to greater damages and forfeitures, and there is no requirement for the Government to demonstrate specific intent to defraud in order to prove liability.

### III. COLLATERAL ESTOPPEL

■ The Government relies principally on the doctrine of collateral estoppel in support of its motion for summary judgment. As noted earlier, Hill, Jr., Lister, and Johnson were convicted of conspiracy to violate the laws of the United States [18 U.S.C. § 371] and of knowingly submitting false statements to the SBA and the FmHA [18 U.S.C. § 1001]. It is well settled that collateral estoppel precludes litigating a factual or legal issue if the identical question has been litigated between the same parties in a prior suit which could not have been decided without its resolution. *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979). Final judgment on a prior suit

"precludes relitigation of issues actually litigated and necessary to the outcome of the first action." *Id.,* 439 U.S. at 326 n. 5, 99 S.Ct. at 649 n. 5 (citing 1B J. Moore, *Moore's Federal Practice,* ¶ 0.405(1), at 622–24 (2d ed. 1974)). Moreover, the doctrine of collateral estoppel applies with equal force to issues litigated in a criminal case when a party seeks to relitigate those same issues in a civil proceeding. *See Emich Motors Corp. v. General Motors Corp.,* 340 U.S. 558, 568, 71 S.Ct. 408, 414, 95 L.Ed. 534 (1951); *In re Raiford,* 695 F.2d 521, 523 (11th Cir.1983). Estoppel extends only to questions directly put in issue and directly determined in the criminal prosecution. *Emich Motors Corp., supra,* 340 U.S. at 569, 71 S.Ct. at 414. The difficult problem presented in this case is discerning exactly what matters were adjudicated in the antecedent criminal suit. In aid of this determination, it is permissible to refer to the criminal case record, including the pleadings, the evidence submitted, the jury instructions, and any opinions of the courts. *Id.,* 340 U.S. at 569, 71 S.Ct. at 414. In applying collateral estoppel, I will consider only the individual defendants, and not WSB and I & E Properties, since, at least technically, collateral estoppel is inapplicable to the latter two because they were not prosecuted in the criminal action. I also recognize that the issue of damages was not litigated in the criminal proceeding.

(A) *Conspiracy.* Hill, Jr. and Lister (along with Johnson, (one of the defaulted defendants in this case) were each convicted of a conspiracy to file false, fictitious, or fraudulent statements in violation of Title 18, *United States Code,* Section 371. Count I of the indictment is set out in full in the margin.[22] With regard to this con-

---

21. Of course, the amendments could not be applied retroactively if to do so would offend the Constitution. The defendants do not assert any constitutionally based arguments. However, I have carefully considered retroactive application of the amendments under both the *ex post facto* clause and the due process clause, and find that neither of those provisions prohibit retroactivity in this case. *See United States v. Security Industrial Bank,* 459 U.S. 70, 78, 103 S.Ct. 407, 412, 74 L.Ed.2d 235 (1978); *United*

States *ex rel. Marcus v. Hess,* 317 U.S. 537, 549–50, 63 S.Ct. 379, 386–87, 87 L.Ed. 443 (1943); *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976); *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 729–30, 104 S.Ct. 2709, 2717–18, 81 L.Ed.2d 601 (1984).

22. COUNT I

From on or about March 1, 1978, until on or about August 31, 1980, in the Northern District

spiracy, the trial court instructed the jury that the Government must prove the following:

■ That two or more persons in some way or manner positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan as charged in the indictment;

■ That the defendant became a member of such conspiracy; and

■ That one of the conspirators during the existence of the conspiracy knowingly committed at least one of the means or methods or overt acts described in the indictment and that such over act was knowingly committed at or about the time alleged in an effort to affect or accomplish some object or purpose of the conspiracy.

[Doc. 176, Government's Ex. 55]

As charged in the indictment, and as the jury was instructed, the "common and unlawful" plan about which the defendants allegedly conspired was the plan to submit false or fraudulent statements to the SBA and the FmHA. The "overt acts" committed in furtherance of the conspiracy were set out in the indictment as eleven separate counts, each being a violation of Title 18, *United States Code*, Section 1001. The conspiracy count itself, however, also included a brief description of the overall object to the conspiracy, as well as a cursory description of some of the false statements submitted to the federal agencies. As to the overall object of the conspiracy,

Count I stated that "[t]he named conspirators planned to make or to have made in these applications and supporting documentation whatever false statements were necessary to induce the named agencies of the United States to guarantee the requested loans." [Doc. 176, Government's Ex. 1]

■ The Government contends that Lister's and Hill Jr.'s convictions under Count I conclusively establish their liability under the conspiracy provisions of the False Claims Act. [31 U.S.C. § 3729(a)(3)] My determination requires a comparison of what issues were essential to the criminal conspiracy conviction with the issues required for liability for conspiracy under the False Claims Act. The applicable provision of the False Claims Act is as follows:

(a) **Liability for certain acts.**—Any person who—

\* \* \* \* \* \*

(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.... [is liable to the United States Government for a civil penalty].

31 U.S.C. § 3729(a)(3)

In order to prevail under Section 3729(a)(3), the Government must prove (1) that the defendant conspired with one or more persons to get a false or fraudulent claim allowed or paid by the United States, and (2) that one or more conspirators performed any act to get a false or fraudulent claim allowed or paid. *See Blusal Meats,*

---

of Florida, and elsewhere, IRA HILL, JR., ROY MAXWELL LISTER, and ROBERT ALLEN JOHNSON, did willfully and knowingly combine, conspire, confederate and agree together with each other, with Nick Charles Mason, William Joseph Dasinger, John W. Whited, Pamela Wells, and with other persons to the Grand Jury unknown to commit the following offenses against the United States: To knowingly and willfully in matters within the jurisdiction of the Small Business Administration and the Farmers Home Administration, both agencies of the United States, make or use a false writing and document containing a fraudulent statement, knowing the same to contain such a statement. The writings and documents were to be applications for loans and loan guarantees for the purchase of Florida Trailer Sales, Eastgate Mobile Home Park, and Big Chief Truck Stop, and associated supporting documentation. These

applications were to be submitted through the Wewahitchka State Bank to the Small Business Administration or the Farmers Home Administration. The named conspirators planned to make or have made in these applications and supporting documentation whatever false statements were necessary to induce the named agencies of the United States government to guarantee the requested loans. These false statements included statements that indicated that Ira Hill, Jr., and Robert Allen Johnson had never been charged with or convicted of a criminal offense, that large deposits had been paid by the prospective purchasers of the named properties and that some prospective purchasers of these properties had substantially more assets than they really had. These acts are in violation of Title 18 of the United States Code, Section 1001 and the entire conspiracy is in violation of Title 18 of the United States Code, Section 371.

*Inc. v. United States,* 638 F.Supp. 824, 828 (S.D.N.Y.1986). A careful examination of the indictment, the criminal jury instructions, the elements of civil liability under Section 3729(a)(3), and the limited case law reveals that defendants Hill, Jr. and Lister are not collaterally estopped from challenging liability for conspiracy under the False Claims Act. In fact, upon analysis, it is questionable whether the False Claims Act's conspiracy provision is applicable in a case such as this.

■■■■ The defendants' convictions under Title 18, *United States Code,* Section 371, required the jury to find beyond a reasonable doubt that each defendant conspired to file a false statement. Thus, the conviction conclusively establishes (1) that the defendants agreed, (2) to file false, fictitious, or fraudulent statements with the SBA and the FmHA, and (3) that one of the named conspirators committed at least one overt act in an effort to accomplish the object of the conspiracy. That the defendants conspired to file false, fictitious, or fraudulent *statements,* however, does not necessarily establish that they conspired to get a false or fraudulent *claim* paid by the United States. This is because a "false statement" is not conterminous with a "false claim." The cases all hold that, in the context of a federal loan guarantee, a "false statement" in a loan guarantee application is not a "false claim." It is the ultimate demand for payment on the gurantee that constitutes the claim. *United States v. McNinch,* 356 U.S. 595, 598, 78 S.Ct. 950, 952, 2 L.Ed.2d 1001 (1958);[23] *United States v. Ridglea State Bank,* 357 F.2d 495, 497 (5th Cir.1966); *United States v. Veneziale,* 268 F.2d 504, 505 (3d Cir. 1959); *United States v. Tieger,* 234 F.2d 589 (3d Cir.1956); *United States v. DiBona,* 614 F.Supp. 40, 42 (E.D.Pa.1984); *United States v. Hibbs,* 420 F.Supp. 1365, 1371

(E.D.Pa.1976), *rev'd on other grounds,* 568 F.2d 347 (3d Cir.1977). It is true that under Section 3729(a)(1) and (a)(2), a defendant who submits a false statement in a loan guarantee application may be held liable for the damage incurred by the United States as a result of the ultimate false claim. *See, e.g., United States v. Miller,* 645 F.2d 473 (5th Cir.1981); *United States v. Hibbs,* 568 F.2d 347 (3d Cir.1977). The innocence of the party making the claim does not alter this result. As will be seen, this rule plays an integral role in the defendants' liability as to Counts II and III of the amended complaint. However, liability under Section 3729(a)(1) and (a)(2) for filing a *false statement* (as opposed to a false claim) derives from the statutory language used in those subsections. Both subsections impose liability on a person who "knowingly presents, or *causes to be presented*" or who "knowingly makes or *causes to be made*" a false claim. [31 U.S.C. § 3729(a)(1), (2) (emphasis added)] In this regard, the false statement on a loan guarantee application has a sufficient nexus with the ultimate "false claim" to fall within the "causation" language of Section 3729(a)(1) and (a)(2).

By contrast, the language of Section 3729(a)(3) clearly requires a conspiracy "to defraud the United States by getting a false or fraudulent *claim* allowed." [31 U.S.C. § 3729(a)(3) (emphasis added)] Thus, a necessary prerequisite to liability under Section 3729(a)(3) is proof that the defendant conspired to get a false or fraudulent claim allowed or paid by the United States. *Blusal Meats, Inc. v. United States, supra,* 638 F.Supp. at 828 (citing *Hageny v. United States,* 570 F.2d 924, 934, 215 Ct.Cl. 412 (1978)); *Murray & Sorenson, Inc. v. United States,* 207 F.2d 119, 123 (1st Cir.1953); *United States v. Cripps,* 460 F.Supp. 969, 975 (E.D.Mich.

---

**23.** The court in *McNinch* rested its conclusion on the use of the word "claim" in the False Claims Act. The court agreed with the Third Circuit's interpretation of "claim" as embodying the notion of a demand for money or for some transfer of property from the Government. *McNinch, supra,* 356 U.S. at 598–99, 78 S.Ct. at 952 (quoting *U.S. v. Tieger, infra*). *See also United States v. Neifert-White,* 390 U.S. 228, 232,

88 S.Ct. 959, 961, 19 L.Ed.2d 1061 (1968) (a "claim" is "an action which has the effect of inducing the government to part with money"). An application for a guarantee, while possibly resulting in a government expenditure some time in the future, does not have the more immediate effect of inducing the Government to part with money or property.

1978); *United States v. Kates*, 419 F.Supp. 846, 851–52 (E.D.Pa.1976). In light of the language of Section 3729(a)(3), I find that a conspiracy to file a false statement under Title 18, *United States Code*, Section 371 is not necessarily tantamount to a conspiracy under the False Claims Act. While the object of the criminal conspiracy in this case was to file false statements to induce federal loan guarantees, it was not necessary for the jury to determine that the defendants also conspired to have demands eventually made on those guarantees. This is true, even though the false statements themselves may have a sufficient nexus with the false claims (the demand on the guarantees) to bring the defendants within Section 3729(a)(1) and (a)(2).

The Government's reliance on *United States v. Kates, supra,* and *United States v. Ben Grunstein & Sons Co.,* 127 F.Supp. 907 (D.N.J.1955), is misplaced. In both cases the defendants were convicted of conspiracy under Title 18, *United States Code,* Section 371, and were collaterally estopped from denying civil liability for conspiracy under the False Claims Act. However, in each case, the defendants themselves had submitted *false claims* for payment from the United States, and, thus, had conspired to defraud the Government by getting false claims paid within the terms of Section 3729(a)(3). Additionally, the defendants in *Kates* and *Ben Grunstein* were convicted on crimes specifically referring to false claims. *Kates, supra,* 419 F.Supp. at 850 (conspiracy to defraud United States by filing false claims); *Ben Grunstein, supra,* 127 F.Supp. at 910 (conspiracy to violate statute prohibiting willful presentation of

false claims to the United States). To the extent that the district court in *United States v. Levinson,* 369 F.Supp. 575 (E.D. Mich.1973), reached a conclusion contrary to mine, I disagree with that case.

By suggesting that a conspiracy to file a false statement is within the scope of Section 3729(a)(3), the Government seeks to enlarge the clear language of that provision. Enlargement of the liability provisions of the False Claims Act, however, is the role of Congress, not the courts. Thus, the defendants convictions under Count I of the indictment do not collaterally estop them from challenging liability under Count I of the amended complaint, and the Government's motion as to Count I is DENIED.

 The application of collateral estoppel as to Counts II and III of the amended complaint, however, is quite different. It has been held that a violation of Title 18, *United States Code,* Section 1001, involving the filing of a false statement collaterally estops a defendant from challenging civil liability under Section 3729(a)(1) or (a)(2).[24] *See Brown v. United States,* 524 F.2d 693, 207 Ct.Cl. 768 (1976). While, as a general rule, a conviction under Title 18, *United States Code,* Section 1001, may often lead to liability under the False Claims Act in cases such as this, it is evident that the conviction itself does not establish all of the necessary elements of a claim for relief under Section 3729(a)(1).

In the criminal trial, the trial court instructed the jury that a violation of Section 1001 consisted of three elements:

---

**24.** In its memorandum, the Government posits that Section 3729(a)(1) or (a)(2) could apply to the defendants' convictions of filing false statements. I believe, however, that the language of Section 3729(a)(1) is most appropriate. That section proscribes conduct in which a person knowingly presents, or causes to be presented, a false claim for payment or approval. [31 U.S.C. § 3729(a)(1)] *As noted earlier, a person filing a false statement in a federal loan guarantee application "causes" a false claim to be presented where demand is made on the guarantee by the holder of the guaranteed mortgage. See* ante at 1174. By contrast, Section 3729 (a)(2) prohibits a person from knowingly making or causing to be made a false statement

*"to get* a false or fraudulent claim paid or approved by the Government[.]" [31 U.S.C. § 3729(a)(2) (emphasis added)] A person filing a false statement in a guarantee application normally does not seek "to get" a false claim paid; that is, he does not seek to have the holder of the mortgage or note make a demand on the guaranteeing agency. Rather, by filing the false statement, he seeks "to get" the guarantee, which, by itself, is not considered to be a claim, *i.e.,* money or property paid by the Government. *United States v. McNinch, supra,* 356 U.S. at 599, 78 S.Ct. at 952–53. Thus, in my discussion of Counts II and III of the amended complaint, I will refer only to Section 3729(a)(1).

First, that the defendant knowingly made a false statement or made or used a false document in relation to a matter within the jurisdiction of a department or agency of the United States as charged;

Second, that the false statement or false document related to a material matter; and

Third, that the defendant acted willfully and with knowledge of its falsity.

[Doc. 176, Government Ex. 65 at 114] The jury was also instructed that the alleged false statements set forth in the indictment, if made, would be "material" as a matter of law. *Id.*

 Thus, Hill, Jr.'s and Lister's convictions on the various substantive counts conclusively establish (for the purpose of the False Claims Act) only that the defendants (1) made false statements or used false documents within the jurisdiction of an agency of the United States, (2) that the statements or documents were material to the matter before the agency, and (3) that the defendants knew that the statements or documents were false. *See United ed States v. Rapoport,* 514 F.Supp. 519, 523 (S.D.N.Y.1981). It remains for the Government to prove that it relied on the false statements [25] [*Woodbury v. United States,* 232 F.Supp. 49, 54 (D.Ore.1964)], and that there had been a false claim. *United States v. Hibbs,* 568 F.2d 347, 350 (3d Cir.1977); *United States v. McNinch, supra,* 356 U.S. at 595, 78 S.Ct. at 950.

As to whether there had been a claim in connection with Count II of the amended complaint, it is undisputed that, following default, the secondary purchaser of the Florida Trailer Sales loan made a demand for payment on the SBA, and that the SBA issued a check on its guarantee in the amount of $331,865.21. With regard to Count III involving the loan to Eastgate Mobile Home Park, it is also undisputed that the secondary purchaser of that loan made a demand on the FmHA, and that the FmHA issued a check on its guarantee in the amount of $348,949.15. The demands for payment constitute false claims under Section 3729(a)(1). *See, e.g., United States v. Ridglea State Bank, supra,* 357 F.2d at 497; *United States v. Veneziale,* 268 F.2d at 505.

 Whether the Government relied on the false statements that were the subject of Hill, Jr.'s and Lister's convictions is a more difficult question.[26] Lister's only

---

**25.** In a prosecution for making a false statement under Title 18, *United States Code,* Section 1001, proof of the agency's actual reliance on the statements is not necessary to sustain a conviction. *United States v. Norris,* 749 F.2d 1116 (4th Cir.1984); *United States v. Cowden,* 677 F.2d 417 (8th Cir.1982). The cases discussing the element of reliance under the False Claims Act do not address whether this requirement finds its roots in the statute or in some common law elements of fraud. *See Woodbury v. United States, supra; United States v. Hibbs, supra,* 420 F.Supp. at 1367. I prefer to base the requirement of reliance in the language of the False Claims Act itself, as well as on common sense. In order for a false statement in a guarantee application to "cause" the submission of a false claim, (*i.e.,* the eventual demand for payment on the guarantee), the Government would certainly need to prove that it relied on a false statement in issuing the guarantee in the sense that, but for the false statement, it would not have issued the guarantee. In the absence of reliance on the false statement, it is difficult to see how the defendant's false statement could have "caused" the false claim. It must be noted that this issue of reliance differs from the issue of reliance and causation relating to the Government's sustained damages. *See* post at 1180–1182.

**26.** The Government contends that each defendant should be liable under the False Claims Act for the false statements of his co-defendants. The Government suggests that "once liability for a conspiracy under the False Claims Act is established, each conspirator is liable for each of the over acts committed pursuant to the conspiracy irrespective of the fact that he did not personally commit the act." *United States v. Cripps,* 460 F.Supp. 969, 975 (E.D.Mich.1978); *see also Pinkerton v. United States,* 328 U.S. 640, 647–48, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946). There are two problems with this theory. First a conspiracy under the False Claims Act has not been established. Second, the jury during the criminal case was instructed on the *Pinkerton* theory of liability, and, as may be seen by the resulting verdict and judgment, did not find each of the defendants so liable. Therefore, for purposes of the Government's motion, and specifically in the context of collateral estoppel as applied to this case, I decline to find that any defendant is liable under the False Claims Act for any acts not giving rise to *that defendant's* conviction.

conviction of filing a false statement that is relevant here involved a statement that Robert Allen Johnson, the loan applicant, had never been criminally charged or convicted, when in fact he had. WSB (who, for purposes of this motion could be held liable for Lister's conduct) argues that there is an issue of fact as to whether the Government actually relied on this particular false statement. Specifically, WSB points to an exhibit which purportedly demonstrates that the SBA became aware of Johnson's criminal record some time around March 21, 1979. (Doc. 136, Ex. A) While the SBA's alleged knowledge postdated its approval of the guarantee, it predated the SBA's approval of the secondary participation agreement, which occurred on or around April 20, 1979. WSB suggests that the SBA's approval of a secondary purchaser, in the face of actual knowledge that Johnson's criminal record was falsely represented in the application, raises an issue of fact as to whether the SBA actually relied on that statement in making its initial decision to approve the guarantee. WSB also refers to language on the application itself, which states that "[t]he fact that you have an arrest or conviction record will not necessarily disqualify you." [Doc. 117, Government's Ex. 27 at 7]

The Government first responds to WSB's contentions by arguing that the false statements of Lister's co-defendants must be imputed to him. I have already rejected this argument. *See* ante fn. 26. Second, the Government contends that the SBA's agreement to enter into the secondary participation agreement proves nothing with respect to reliance. The Government asserts that the only effect of the secondary participation agreement was to obligate the SBA to purchase the guaranteed portion from a third party without regard to WSB's negligence, fraud, or misrepresentations. [Doc. 176, Government's Ex. 32] The SBA still retained its rights to proceed against the bank, or any other party who participated in the fraudulent submission of the application. This argument, however, misses the mark. The fact that the SBA retained remedies against the wrongdoer even after entering into a secondary

participation agreement does not obviate the possibility that the SBA could have relieved itself of *all* liability by rescinding the guarantee before entering into the secondary participation agreement on the basis of a material misrepresentation relating to the applicant's criminal history. By choosing not to do so, an inference may be drawn that the misinformation regarding Johnson's criminal record was not significant, and that the SBA did not rely on it in the first instance.

Consequently, even though it is undisputed that Lister made a false statement in a document used to obtain the SBA guarantee, and that a false claim was made respecting the Florida Trailer Sales loan, there is a genuine dispute of material fact as to whether Lister's particular false statement caused the false claim within the meaning of Section 3729(a)(1) of the False Claims Act. The Government has failed to carry its burden under Rule 56(c) of demonstrating that no genuine dispute exists as to the SBA's reliance on Lister's false statement. The Government's motion is, therefore, DENIED as to defendant Lister.

As to defendant Hill, Jr., however, the record evidence supports a contrary conclusion. Certainly, Hill, Jr. was also convicted of filing a false statement relating to Johnson's criminal history, and to that extent, there is a genuine issue whether the SBA relied on that false statement in approving the Florida Trailer Sales loan guarantee. Unlike Lister, however, Hill, Jr. was convicted on other substantive counts relating to both the Florida Trailer Sales guarantee and the Eastgate guarantee. [Doc. 176, Government's Ex. 1] With regard to the Florida Trailer Sales guarantee, Hill, Jr. was convicted of falsely representing that Johnson, the prospective purchaser, had made an additional $10,000 payment toward the purchase of the business. *Id.* As to the Eastgate guarantee, Hill, Jr. was convicted of falsely representing his net worth and falsely stating that Pamela Wells, the prospective purchaser, had made a $5,000 down payment and would provide an additional $35,000 toward the purchase at closing. The nature of these false state-

ments is evident; they each have a direct impact on the financial integrity of the transaction and on whether the loan would be repaid. The federal agencies' reliance on these types of statements is sufficiently clear to conclude that, in the absence of evidence to the contrary, no reasonable jury could determine other than that reliance existed. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986). This result is especially warranted with regard to the false statements relating to the Eastgate guarantee. Originally, and on the basis of Wells' pre-application, the FmHA discouraged her from submitting a formal application. In particular, the FmHA believed that the proposed $40,000 start-up equity was too thin and that Wells had inadequate personal resources and a lack of management experience. Hill, Jr. then came to Wells' assistance by providing supplemental information stating that he would personally guarantee the loan, that he would advance $20,000 in working capital, and that he had a net worth in excess of $3 million. The FmHA then stated that a formal application could be developed, and eventually approved the application subject to certain conditions. Based on this sequence of events, it is apparent that the FmHA relied on Hill, Jr.'s false statements, particularly as to his net worth, in eventually approving the guarantee.

Thus, on the basis of the doctrine of collateral estoppel and in light of the uncontroverted facts and record evidence, Hill, Jr. is liable for violating Section 3729(a)(1) of the False Claims Act under Counts II and III of the Government's amended complaint.

The Government also seeks to hold WSB and I & E Properties liable under the doctrine of *respondeat superior.* The Government posits a number of legal and factual theories for holding the corporate entities responsible for the criminal acts of Hill, Jr. and Lister, who were then the presidents of I & E Properties and WSB, respectively. My discussion of corporate liability under the False Claims Act, however, will be limited to the possible liability of I & E Properties, since I have already ruled that the Government is not entitled to summary judgment with regard to defendant Lister, the individual through whom the Government seeks to hold WSB liable.

■ Binding precedent in this circuit clearly holds that, in cases brought under the False Claims Act, an entity will not be held responsible for the acts of one of its employees unless the employee was acting within the scope of his authority and with the purpose of benefitting the entity. *See Grand Union Co. v. United States*, 696 F.2d 888, 891 (11th Cir.1983); *United States v. Hangar One, Inc.*, 563 F.2d 1155, 1158 (5th Cir.1977); *United States v. Ridglea State Bank, supra*, 357 F.2d at 500 (knowledge or guilty intent of agent not imputed to employer when latter is sought to be held liable under a statute requiring knowledge or guilty intent).

The Government argues that the Supreme Court's decision in *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982) ["*ASME*"], has effectively overruled the cases in this circuit requiring proof that the agent acted with the purpose to benefit the corporation. In *ASME*, the Court held that a corporation could be liable for treble damages under the antitrust laws for violations committed by its agents who were acting within the scope of their apparent authority, irrespective of whether they were acting for the benefit of the corporation. *Id.*, 456 U.S. at 565–70, 575–76, 102 S.Ct. at 1942–44, 1947–48. The Court reasoned that, by holding the corporation liable for the acts of its agents committed with apparent authority, the purposes of compensation and deterrence embodied in the antitrust laws would be furthered. *Id.*, 456 U.S. at 575–76, 102 S.Ct. at 1947–48. The Government recognizes that *ASME* was an antitrust case, but contends that the court's reasoning is equally compelling in the context of the False Claims Act.

The Government's invitation to apply *ASME* to the issues of corporate liability under the False Claims Act has merit.

However, I am reluctant to do so on the basis of *Grand Union Co., supra. Grand Union*, a case involving the False Claims Act in applying the rule that there must be a showing that the agent's purpose was to benefit the corporation, was decided by the Eleventh Circuit on January 24, 1983, and nowhere in the opinion does the appellate court cite to *ASME*, which was decided on May 17, 1982. Accordingly, in the absence of controlling authority rejecting the "benefit to the corporation" rule in False Claims Act cases, I decline to do so at this time.

The Government next argues that the 1986 amendments to the False Claims Act effectively abrogate the rule of corporate liability stated in *Grand Union* and other cases. Specifically, the Government asserts that this corporate liability rule was bottomed in the requirement that a specific intent to defraud was needed in order to establish False Claims Act liability prior to the 1986 amendments. Now that the 1986 amendments have done away with the intent to defraud requirement, the Government argues that there is no need to apply the more restrictive corporate liability rule. Again, however, I am constrained to reject the Government's interpretation of the impact that the 1986 amendments has in this context.

■ In *Ridglea State Bank, supra,* the former Fifth Circuit addressed the issue of whether the intent of a self-serving employee should be imputed to his employer under the False Claims Act, or whether it would be necessary to show that the employee's purpose in acting was to benefit the employer. After examining the policy reasons for the two alternative approaches, the court held that False Claims Act cases

> differ basically from the ordinary civil case in which the intent of a self-serving employee is imputed to his employer. Instead, the case calls for the application of the rule we discussed in *Standard Oil Co. of Texas v. United States,* 307 F.2d 120 (5th Cir.1962); that is, that the knowledge or guilty intent of an agent not acting with a purpose to benefit his employer, will not be imputed to his employer, when the latter is sought to be held liable under a statute requiring knowledge or guilty intent.

> *United States v. Ridglea State Bank, supra,* 357 F.2d at 500.

As is clear from this passage, a civil statute requiring knowledge *or* guilty intent will invoke the rule that liability may be imputed only when a corporate agent acts to benefit the corporation. Thus, even though a "guilty intent" to defraud is no longer an element under the False Claims Act, it is still necessary under Section 3729(a)(1) or (a)(2) for the Government to prove that the defendant knowingly submitted a false claim. And, when the civil statute requires the wrongdoer to possess "knowledge," his knowledge will not be imputed to the corporation unless he was acting to benefit that corporation. *Ridglea State Bank, supra,* 357 F.2d at 500.

■ The Government's final argument regarding corporate liability is factual. Essentially, the Government contends that, even under the "benefit to the corporation" rule, the evidence is undisputed that both Lister and Hill, Jr. acted with the purpose of benefitting their respective corporations. As noted, there is no need for me to address this argument as to Lister and WSB at this time. Suffice it to say that, at trial, the Government will be required to prove that Lister acted to benefit WSB, if the Government seeks to hold the bank liable under the theory of *respondeat superior.* As to Hill, Jr. and I & E Properties, it is undisputed that, at all times relevant to this case, Hill, Jr. was president of I & E Properties, the corporation which owned Florida Trailer Sales and Eastgate Mobile Home Park. Additionally, the record is clear that the SBA and the FmHA relied on Hill, Jr.'s false statements in approving the loan guarantees, which ultimately allowed I & E Properties to sell its properties to Johnson and Wells. The proceeds from the Florida Trailer Sales loan and the Eastgate loan were then used by I & E Properties, in part, to pay off its debts to WSB and other lending institutions. I & E Properties does not contest this fact. Thus, in light of the undisputed facts, the Government has established that Hill, Jr. was acting within

his authority as president of I & E Properties and was acting to benefit the corporation. I & E Properties has made no argument nor pointed to any evidence which would raise a genuine issue of material fact as to the question of benefit to the corporation. Thus, I & E Properties is vicariously liable under Counts II and III of the amended complaint.

## IV. DAMAGES AND FORFEITURES

The last issue arising under the False Claims Act in this case involves damages and forfeitures. The Government contends that it is entitled to a judgment of treble damages against each defendant, jointly and severally. In addition, the Government seeks forfeitures of $30,000 (three forfeitures times the $10,000 maximum forfeiture provided by the 1986 amendments), or $10,000 for each of Counts I through III.

The defendants contend that the Government is not entitled to damages as a matter of law and that genuine disputes of fact remain as to whether the Government's damages were caused by the defendants' false statements. As a result of my earlier rulings, the discussion of damages is limited to Hill, Jr.'s and I & E Properties' liability under Counts II and III of the amended complaint. However, the principles set out here should be applicable to future proceedings in this case.

(A) *Damages.* Under the False Claims Act as amended in 1986, the Government is entitled to "3 times the amount of damages which [it] sustains *because* of [the acts of the defendant who violated the False Claims Act]...." [31 U.S.C. § 3729(a) (emphasis added)] Prior to 1982, the False Claims Act contained similar language which permitted the Government to recover double damages that it sustained "by reason of" the defendants' act or acts. [31 U.S.C. § 231 (1976)] Courts have interpreted the phrase "by reason of" as incorporating an element of causation between the defendants' violation of the False Claims Act and the Government's damages. *See United States v. Miller,* 645 F.2d 473, 475–76 (5th Cir.1981); *United States v. Hibbs,* 568 F.2d 347, 351

(3d Cir.1977); *United States v. Rapoport,* 514 F.Supp. 519, 524–25 (S.D.N.Y.1981). While I find no cases interpreting the language found in the current version of the Act allowing recovery of damages sustained "because of" a defendant's acts, it seems clear to me that the language is substantially the same as that which is found in the former version of the Act. Hence, the Government must establish that its damages were caused by the defendants' violation of the False Claims Act.

The Government contends that no genuine issue of fact exists as to whether it sustained damages because of the defendants' conduct. On the other hand, defendant Hill, Jr. and I & E Properties (along with WSB and Lister) rely on *United States v. Hibbs,* 568 F.2d 347 (3d Cir.1977), for the proposition that it is insufficient for the Government to show merely that "but for" the false statements, the federal agencies would not have guaranteed the loans and, thus, would not have suffered damages.

In *Hibbs,* a real estate broker seeking to have the Federal Housing Administration ("FHA") issue certain mortgage guarantees, falsely certified that the plumbing, electrical, and heating systems of the houses met FHA standards. The FHA subsequently issued the mortgages and was forced to pay $59,000 when the mortgagors defaulted. At trial, the district court found that the FHA relied on the false certifications in issuing its commitments to insure the mortgages, and that the FHA would not have insured the mortgages had it not been for the submission of the false certifications. *United States v. Hibbs, supra,* 420 F.Supp. at 1367. The court also found that the defaults were caused by circumstances unrelated to the condition of the dwellings. *Id.,* 420 F.Supp. at 1371. Nevertheless, on the basis of its finding that the FHA relied on the false certifications, the court ruled that there was a sufficient causal connection between the defendants' false certifications and the Government's loss:

For whatever reason the mortgage defaults occurred, whether because of defi-

ciencies in the properties or because of financial irresponsibility of the mortgagors, or for any other reason, the fact remains that the United States had to make good on mortgage insurance obligations it would not have assumed *but for* the false certifications.

> *United States v. Hibbs, supra,* 420 F.Supp. at 1372 (emphasis added).

On appeal, the Third Circuit reversed, holding that the use of the language "by reason of" in the False Claims Act required the consideration of causation. Further, the appellate court rejected the Government's position that its damages stemmed from the false certifications in the sense that the FHA would not have insured the mortgages and would not have been called upon to honor them but for the false certifications. Rather, the court held that the Government's damages were caused by the defaults, not by the false certifications. "Indeed, precisely the same loss would have been suffered by the Government had the certifications been accurate and truthful." [27] *United States v. Hibbs, supra,* 568 F.2d at 351. The court did note, however, that the causation requirement might be met where the false statements are related to the default, for example, where the statements are "critical to eligibility for a loan" or where they "[bear] upon the likelihood of the applicant's meeting mortgage payments." *Id.,* 568 F.2d at 352.

The court's analysis in *Hibbs* was embraced by the former Fifth Circuit in *United States v. Miller,* 645 F.2d 473 (5th Cir. 1981). "The language of the statute clearly requires that before the United States may recover double damages, it must demonstrate the element of causation between the false statements and the loss." *Id.,*

645 F.2d at 475–76. Moreover, the court in *Miller* recognized that the causal connection between the Government's loss and the false statements could be established where the false statements were related to the ability of purchasers to meet their financial obligations. *Id.,* 645 F.2d at 476; *see also id.* at nn. 2 & 3.

 Within the framework of *Hibbs* and *Miller,* I must determine whether the Government sustained damages "because of" Hill, Jr.'s false statements. Hill, Jr. was convicted of making two false statements relating to the Florida Trailer Sales loan which are relevant to this motion: (1) that Johnson had no criminal history; and (2) that Johnson had made an additional $10,000 payment to the purchase of Florida Trailer Sales. While there may be some question as to whether Johnson's criminal convictions actually related to his ability to make the loan payments or were "critical to eligibility for a loan," it appears that the false statement with regard to the $10,000 payment is causally connected to the default as required by *Miller* and *Hibbs.* Had Johnson actually injected the additional equity into the business, the risk that the Government would have to honor its guarantee would have been reduced. In addition, the regulations require that, in order to procure an SBA guarantee, there must be sufficient capital in the business to enable it to operate on a sound basis. 13 C.F.R. § 122.16 (1978). Thus, the statement regarding Johnson's investment into the business is highly relevant to eligibility and, thus, is causally connected with the Government's damages. Accordingly, the Government is entitled to damages against Hill, Jr. and I & E Properties as to Count II of the amended complaint equal to triple

---

**27.** The Third Circuit's reasoning was severely criticized in S.Rep. No. 99–345, *supra,* at 20. However, the proposed amendment directed to the result in *Hibbs* was not enacted. I note, however, that the Third Circuit's conclusion— *i.e.,* that the Government would have suffered the same loss had the false certifications been truthful—raises a serious question about its basis. The district court found that the FHA "would not have undertaken to insure the mortgages against default had it not been for the submission of the false certfications." *United*

*States v. Hibbs, supra,* 420 F.Supp. at 1367. The Third Circuit did not hold that this factual finding was clearly erroneous. In light of this fact, it is difficult to see how the Government's damages would have been the same irrespective of the veracity of the certifications. If they were accurate, that is, if they correctly stated that the plumbing, electrical, and heating systems were not in compliance with FHA standards, the FHA would have refused to guarantee the mortgages and would not have lost any money.

the losses it actually incurred, reduced by payments received from any other source. *United States v. Bornstein*, 423 U.S. 303, 313–17, 96 S.Ct. 523, 530–32, 46 L.Ed.2d 514 (1976). The resulting amount is $920,-129.88.[28] [Doc. 176, Government's Ex. 35]

■ Similarly, Hill, Jr.'s false statements in connection with the Eastgate Mobile Home loan involved his net worth and the amount Wells paid toward the purchase of Eastgate. As a guarantor on the loan, Hill, Jr.'s net worth is clearly related to his ability to honor his guarantee. Additionally, statements regarding Wells' $40,000 capital contribution related directly to her eligibility for the guarantee. Consequently, a sufficient causal connection exists between the false statements and the Government's loss. As to Count III of the amended complaint, the Government is entitled to a damage award against defendant Hill, Jr. and I & E Properties in the amount of $767,416.[29]

■ (B) *Forfeitures.* The 1986 amendments also provide that a defendant who violates the False Claims Act is liable to pay a forfeiture of between $5,000 and $10,000 for each violation of the Act. The Government need not show causation to be entitled to a forfeiture. *United States v. Miller, supra,* 645 F.2d at 476 n. 4. The range in the amount of forfeitures apparently represents congressional intent to allow discretion in assessing forfeitures. In view of the facts in this case, I find that Hill, Jr. and I & E Properties are jointly and severally liable under the forfeiture provisions for $10,000 in connection with these defendants' liability under Counts II and III of the amended complaint.

## V. BREACH OF CONTRACT

Finally, the Government seeks summary judgment against WSB for breach of the bank's guarantee contracts with the SBA and the FmHA. [*Amended Complaint,*

doc. 50, Counts IV–VI] The Government posits two grounds for its breach of contract claims. First, the Government argues that Lister's criminal conduct must be imputed to WSB and that his conduct amounts to a breach of the guarantee contracts. This ground relates to both the Florida Trailer Sales guarantee with the SBA and the Eastgate guarantee with the FmHA. Second, the Government argues that, in contravention of the guarantee agreements, WSB received a benefit in connection with the Florida Trailer Sales and Big Chief Truck Stop loans.

■ To the extent that the Government seeks to hold WSB liable for breach of contract based on Lister's criminal conduct, my previous rulings preclude this result at this time. The Government also contends, however, that WSB benefitted from the SBA guaranteed loans in that the proceeds were used to pay over $135,000 in outstanding unsecured loans made earlier by the bank. The Government does not appear to argue that the loan proceeds were disbursed improperly in the first instance, but rather that some of the proceeds were eventually used to pay off other loans. The Government's position is that, by receiving benefits from the loans, WSB failed to comply with the guarantee agreements and federal regulations. The fact that some of the loan proceeds were used to repay other loans made by WSB, however, is not, in and of itself, conclusive of whether WSB received a direct or indirect benefit. In fact, the language of the guarantee agreements upon which the Government relies does not necessarily contemplate WSB's receipt of payments on other loans as "benefits." According to the SBA loan guarantee agreement the "[l]ender shall not directly or indirectly charge or receive any bonus, fee, commission or other payment or benefit in connection with mak-

---

**28.** The SBA was required to pay $331,865.21 upon default. When tripled, the damage is $995,595.63. It is also undisputed that the Government received $72,465.75 from the liquidation of Florida Trailer Sales. This amount is subtracted from the trebled amount resulting in the total damages.

**29.** The FmHA was required to pay $348,949.15. This amount, when tripled, equals $1,046,-847.45. From this subtotal is subtracted the amount received by the Government from the sale of Eastgate and Wells' home: $269,431.45.

ing or servicing any loan...." [Doc. 176, Government's Ex. 3 at 2] Similar language appeared in the SBA loan settlement sheets. [Doc. 176, Government's Ex. 30] The use of the specific words "bonus," "fee," and "commission," before the more general phrase "other payment or benefit" indicates an intent to prohibit payments of amounts which could be perceived as contingent fees or "kick-backs" for procuring the federally guaranteed loans. The interpretive rule of *ejusdem generis* would limit the more general term at the end of the list of prohibited "benefits" to the class of terms more specifically designated. I do not hold that the use of the proceeds did not benefit WSB in this case; I find only that it is not undisputed from the language of the SBA loan guarantee agreement or settlement sheet that the use of the proceeds was a breach of the contract. Further evidence is necessary as to the intent and meaning of the contract provision precluding "benefits." Additionally, even if WSB breached the guarantee agreements by receiving a benefit, it is not entirely clear whether such a breach was material.

It is evident that the Government's breach of contract claims against the bank involves Lister's criminal conduct and an examination of the circumstances surrounding the loan; genuine issues of fact remain. Thus, the motion is DENIED as to Counts IV through VI of the amended complaint.

## VI. CONCLUSION

The Government's motion for summary judgment is GRANTED as to defendant Ira Lee Hill, Jr. and defendant I & E Properties, Inc. regarding Counts II and III of the Government's amended complaint. The motion is otherwise DENIED.