UNITED STATES of America, ex rel. Harold LaVALLEY, Plaintiff,

v.

The FIRST NATIONAL BANK OF BOSTON, Defendant.

Civ. A. No. 86–0236–WF.

United States District Court, D. Massachusetts.

Aug. 23, 1988.

Sheehan, Phinney, Bass & Green, P.A. by Michael C. Harvell, Manchester, N.H., Morris M. Goldings, Mahoney, Hawkes & Goldings, Boston, Mass., Vincent B. Terlep Jr., Atty., Civ. Div., Dept. of Justice, Washington, D.C., U.S. Atty. Office, Martha Susman, for plaintiff.

Bingham, Dana & Gould by E. Susan Garsh, Thomas H. Walsh, Jr., Andrea H. Maislen, Michael J. Tuteur, Goodwin, Proctor & Hoar, Boston, Mass., T. Jeremy Gunn, Washington, D.C., for First Nat. Bank of Boston.

James D. Masterman, Edward I. Masterman, Cargill, Masterman & Culbert, Boston, Mass., for Leland B. Goldberg.

## MEMORANDUM AND ORDER

WOLF, District Judge.

Plaintiff Harold LaValley brought this action on June 7, 1985 in the name of the United States pursuant to the False Claims Act, 31 U.S.C. § 3730, to recover sums paid by the Farmer's Home Administration of the Department of Agriculture ("FmHA") in accordance with a $24.7 million federally guaranteed loan to the Elmendorf Board Corporation ("Elmendorf"). On April 29, 1986, defendant First National Bank of Boston ("Bank of Boston" or "Bank") moved to dismiss plaintiff's complaint for

lack of subject matter jurisdiction. Defendant argued that plaintiff's action is based upon evidence or information the government possessed when the action was brought and, therefore, plaintiff's action is barred pursuant to 31 U.S.C. § 3730(b)(4).

On September 10, 1986, the court held a hearing in this case and took the motion to dismiss under advisement. On October 27, 1986, the False Claims Act was amended, altering the relevant provisions of the Act. In short, the new amendments no longer require that the relator, in this case LaValley, base his action on evidence or information which the government does not itself possess. Instead, an action can proceed if the relator was an "original source" of the information possessed by the government.

This court must therefore determine:

(1) whether the provisions of the 1986 amendments to the False Claims Act ("1986 Amendments") apply retroactively to this case;

(2) if they do, whether this court has subject matter jurisdiction over this suit under the new provisions; and

(3) if they do not, whether the government possessed enough information of the alleged fraud to bar jurisdiction under the old provisions.

The court held supplemental hearings on December 15, 1987 and June 2, 1988, and received post-hearing briefs. For the reasons stated below, the court concludes that the relevant provisions of the 1986 Amendments apply retroactively in this case, and that LaValley has standing under the new law. The defendant's motion to dismiss is, therefore, denied.

## I. FACTS

### A. *The Relator's Complaint*

This action was brought on June 7, 1985, by a group of private citizens under the *qui*

*tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b) *et seq.* (1982 ed.). The private citizens, known as relators, alleged that the Bank of Boston defrauded the Government by making false statements to the FmHA in connection with an application for the guarantee of $24.7 million in Bank of Boston loans to Elmendorf for the financing of an oriented strandboard mill. The relators, Harold LaValley, Dr. Gilbert Beinhocker, and Robert G. Watts, were investment bankers involved in the transaction. Subsequently, two of the three original relators withdrew from the suit.

The equity closing for the mill occurred in July 1979. In November, 1981, the closing of the permanent debt financing occurred, with the Bank of Boston placing the permanent debt as lead lender. At that closing, the FmHA gave its guaranty of 90% of the debt.

For various reasons, including the depressed state of the housing business and production problems at the new plant, the financial condition of Elmendorf deteriorated, and by late 1983, Elmendorf defaulted on the loans to the Bank of Boston. The Bank made a claim to FmHA under the guarantee, and FmHA repurchased the guarantee in September, 1983 for $25,628,849.02 (an amount which included past due interest).[1] There is no dispute concerning the reasons for Elmendorf's ultimate default. Those reasons were known to all parties, including FmHA, at the time the claim was made to FmHA to honor the guarantee.[2] Thus, there is no claim by the relator that there was fraud in connection with the Bank's actual claim under the guarantee.

Instead, the relator claims that the fraud occurred on November 13, 1981, when the Bank presented an allegedly false certifi-

---

1. Elmendorf was subsequently liquidated in bankruptcy, and FmHA received $4,371,281.95 from the sale. Therefore, FmHA suffered a loss of $21,257.09 on the loan.

2. While the fraud in this case is alleged to have occurred at the time application for the guarantee was made, there can be no violation of the False Claims Act until a claim is made. *United States v. McNinch*, 356 U.S. 595, 78 S.Ct. 950, 2 L.Ed.2d 1001 (1958) (false application for FHA

loan guarantee held not to be a "claim" which could form the basis for liability under the Act). Liability arises, and the False Claims Act's statute of limitations begins to run, from the date of claim. *United States v. Goldberg*, 256 F.Supp. 540 (D.Mass.1966); *United States v. Klein*, 230 F.Supp. 426, 441–42 (W.D.Pa.1964); *aff'd per curiam w.o. opinion*, 356 F.2d 983 (3rd Cir. 1966); *United States v. Globe Remodeling*, 196 F.Supp. 652, 655 (D.Vt.1961).

cate to FmHA which induced FmHA to agree to the guarantee in the first place. It is alleged that the certificate, known as a "material adverse change report," was false in that it did not apprise the FmHA that the Bank felt, at that time, that the loan was "hopeless," and would probably not be repaid. As evidence of the Bank's conclusion, the complaint alleges that approximately five months before the loan was closed, the Bank transferred the loan to a special section of the Bank which dealt with problem loans destined for liquidation.

The relator alleges that the Bank further defrauded the FmHA because, at the time it submitted the material adverse change report, it really did not believe the statement in the report contending that the planned infusion of an additional amount of working capital at the time the loan was closed (the debt closing) would counteract the adverse effects that the economy and reduced production capacity would have on the plant during its start-up period.

The complaint also alleges that on November 10, 1981, the Bank represented to FmHA that it had no reason to believe that the investors in the project, several major insurance companies, would fail to supply further working capital after the loan was closed. However, the relator alleges that by November 13, 1981, the date of the material adverse change report, the Bank believed that the investors would not commit further funds to the project and failed to so inform FmHA.

The complaint further alleges that the Bank failed to inform FmHA through the material adverse change report of significant misgivings it had about Elmendorf's management, the plant facility, untested markets and uncertain sources of supply. Additionally, the relator alleges that, at the time it presented its material adverse change report, the Bank knew of certain design problems with the plant and of other technical flaws which affected the plant's expected production, yet they failed to so inform FmHA.

Finally, the relator alleges that a conflict of interest existed because of the Bank's alleged special relationship with the construction lender on the project, Swiss Bank Corporation, and that the Bank's alleged fraud was prompted by its desire to ensure that Swiss Bank Corporation would suffer no loss on its construction loan.

### B. *The Trustee's Complaint*

On February 22, 1984, approximately five months after FmHA repurchased its guarantee, Beinhocker and Watts, two of the original relators in this action, and two of the investment bankers involved in the transaction, caused an involuntary petition in bankruptcy to be filed against Elmendorf and its parent holding company, Stranway Corporation. On August 24, 1984, the Trustee in bankruptcy filed a complaint to disallow subordinate claims, seeking, *inter alia,* the disallowance of all claims by the Bank, the United States, and the investors in both Elmendorf and Stranway on the ground that their claims should be treated as equity capital provided principally by insiders at a time when there was no reasonable expectation that the funds, if viewed as loans, would be repaid. The Trustee's complaint contained no allegation that the Bank of Boston had defrauded FmHA or had failed to inform FmHA of relevant information when it submitted its material adverse change report at the time of the debt closing. The Trustee's complaint contained information obtained from a meeting with Beinhocker in which Beinhocker claims he gave information on behalf of a joint venture, ELV, formed by Beinhocker, Watts and LaValley sometime shortly after February 22, 1984.

### C. *The February 13, 1984 Letter*

On February 13, 1984, Beinhocker and Watts sent a letter to the Bank. After reciting many complaints about how the Bank and other parties to the transaction had treated the investment bankers, Dr. Beinhocker and Mr. Watts informed the Bank:

> Be advised that we are retaining litigation counsel, and are in the process of conveying all information to them. We expect as soon as possible to file a com-

plaint against you alleging serious improprieties.

Letter from Beinhocker to the Bank of Boston, February 13, 1984, p. 3.

Neither Beinhocker nor Watts sent a copy of their February 13, 1984 letter to the Government. The Bank, however, sent a copy of the letter to the FmHA State Director in Vermont by letter of February 15, 1984.

### D. *Mr. Demchenko*

In early 1985, Beinhocker, Watts and LaValley met Eugene Demchenko, a Bank of Boston employee who had worked on the Elmendorf Bankruptcy while employed with the Bank. *See* Affidavit of Beinhocker at ¶ 14. *But see* Affidavit of Leland Goldberg at ¶ 6. ("Mr. Beinhocker's statement in Paragraph 14 of his affidavit that Mr. Demchenko had worked for me and others in connection with the Elmendorf Bankruptcy is false."). Demchenko allegedly provided the group and their counsel with highly credible information concerning the alleged fraud, later confirmed by documents from the files of the Bank obtained in discovery. In June, 1985, LaValley, Beinhocker and Watts filed this suit. In September, 1986, the Complaint was amended, eliminating Beinhocker and Watts as participants in the suit because the statute permits only one individual to serve as the relator.

## II. HISTORY OF THE FALSE CLAIMS ACT

### A. *The Original Act of 1863*

The False Claims Act was adopted in 1863 to combat rampant fraud in procurement during the Civil War. Act of March 2, 1863, c. 67, 12 Stat. 696. It was later reenacted by Rev.Stat. §§ 3490–3494 and 5438 (1878).

There were few reported cases under the False Claims Act during the first three decades of this century. However, in the late 1930's, a number of so-called "parasitical actions" were brought under the Act. In one such suit, *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 63 S.Ct. 379,

87 L.Ed. 443 (1943), the United States contended that an action brought by an informer who simply copied an indictment in a criminal case should be barred under the provisions of the False Claims Act because he brought no information of his own to the suit, and therefore, allowing him to recover would be inconsistent with the purposes of the Act. The United States also contended that such suits created an unseemly race to the courthouse between the Government's civil lawyers and private parties, and infringed upon the Attorney General's control over criminal and civil fraud actions. In rejecting the contentions of the United States, the Court ruled that the statute, as then written, did not require that the relator bring original information to the suit, or that the Attorney General have exclusive control over Government civil fraud litigation.

### B. *The 1943 Amendments*

The Court's ruling in *United States ex rel. Marcus v. Hess* prompted the introduction of several bills to repeal or change the *qui tam* provisions of the Act. The 1943 amendments signed into law provided that the relator first file an action in court, and then serve the Attorney General with a copy of the Complaint and a written disclosure of any evidence and information in his possession. The Attorney General would be afforded 60 days after service of those documents to enter the appearance of the United States and to take over the action. The amendments also required that the suit be based on information not previously possessed by the Government. As the Conference Bill stated:

> The court shall have no jurisdiction to proceed with any such action brought under clause (B) or pending suit brought under section 3491 of the Revised Statutes whenever it shall be made to appear that such suit was based upon evidence or information in the possession of the United States or any agency, officer, or employee thereof, at the time such suit was brought.

89 Cong.Rec. 10844, col. 2 (1943). The exception to the jurisdictional bar contained in the original proposed Senate Amendment

for a relator who was an original source of the information which was used in a government investigation was deleted.

The 1943 amendments also provided, in section (E)(1), that in the event that the Government took over an action brought by a relator, the Court could award the relator, out of the proceeds collected, fair and reasonable compensation not to exceed 10% of the proceeds. To reinforce Congress' purpose of precluding "parasitical suits," while continuing to encourage those with direct and independent knowledge of the fraud to come forward, the new law made clear that the 10% bounty was to be paid to the relator as a reward for his disclosure of the information and evidence not in the possession of the United States when the suit was brought. 89 Cong.Rec. 10845, col. 3 (1943).

The 1943 amendments were signed by the President on December 21, 1943. The provisions of the statute were codified at 31 U.S.C. §§ 232–235 (1976).

At the time this action was brought in 1985, 31 U.S.C. § 3730(b)(4) provided: [3]

Unless the Government proceeds with the action, the court shall dismiss an action brought by the person on discovering the action is based on evidence or information the Government had when the action was brought.

### C. *The 1986 Amendments*

In October of 1986, Congress again amended the False Claims Act. In relevant part, 31 U.S.C. § 3730(e)(4)(A) now provides,

No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from news media, unless the

action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information. ·

The 1986 amendments to the False Claims Act were prompted largely by restrictive interpretations by some courts of the False Claims Acts' liability and burden of proof standards, and by the apparent inequities imposed on private citizens by the statute's *qui tam* jurisdictional bar. *See* S.Rep. 345, 99th Cong., 2d Sess. 4, U.S.Code Cong. & Admin.News pp. 5266, 5269.

With regard to the *qui tam* provisions, the new amendments were designed to "encourage more private enforcement suits." S.Rep. 345 at 23–24. The legislative history in both houses of Congress reveals a sense that fraud against the Government was apparently so rampant and difficult to identify that the Government could use all the help it could get from private citizens with knowledge of fraud.

The Senate bill was passed and reported out by the Senate Judiciary Committee on July 28, 1986. When it was taken up on the floor of the Senate on August 11, 1986, it was immediately amended. Senate Amendment 2701 included the provisions of the Senate's original bill designed to eliminate the inequities suffered by "honest informers" with direct knowledge of the fraud, who either reported the information to the Government or to the news media prior to bringing suit. Under the prior law, such disclosures would have invoked the

---

**3.** In 1982, title 31 of the United States Code, including the provisions of the False Claims Act, was enacted into positive law. The False Claims Act, which was formerly found at 31 U.S.C. §§ 231–235, was re-codified at 31 U.S.C. §§ 3729–3731. Although some sections of the Act were shifted from their prior positions, and

simple language was substituted for awkward and obsolete terms, Congress intended that the recodification make no substantive change in the law. *See,* H.R.Rep. No. 97–651, 97th Cong., 2nd Sess. 3, *reprinted in* 1982 U.S.Code Cong. & Ad. News pp. 1895, 1896.

jurisdictional bar. However, Senate Amendment 2701 also eliminated the provisions which were intended to allow citizens without direct information of the fraud to prompt the Government to act on information already in its possession as proposed in the original Senate bill. Thus, the Senate continued to bar the same type of "parasitical suits" based on publicly disclosed information which were the concern of Congress in 1943.

The portion of Amendment 2701 establishing the jurisdictional bar was ultimately enacted into law, with one minor amendment. New subsections 31 U.S.C. § 3730(e)(5)(A) & (B) would bar suits which were "based on" the public disclosure of allegations or transactions by the Government or the news media, except where the relator could demonstrate that he was an "original source" of the information "to the entity that disclosed the allegation." 132 Cong.Rec. S11244, col. 1.

On September 9, 1986, the House of Representatives had before it both S. 1562, which had been passed by the Senate, and its own Bill, H.R. 4827. On that day, the House passed H.R. 4827, and voted to amend S. 1562 by deleting the Senate's provisions and substituting all of the provisions of H.R. 4827. Both bills were sent to the Senate.

On October 3, 1986, the Senate took up the House bill and proposed to amend it by deleting its provisions and substituting a new Senate Amendment 3214. In relevant part, Senate Amendment 3214 incorporated the provisions of Senate Amendment 2701 relating to the *qui tam* jurisdictional bar, with one important exception. While the concept of public disclosure continued to include both disclosure by the Government and disclosure by the news media, the definition of an "original source" was restricted so to apply solely to persons who had voluntarily provided information to the Government. Senate Amendment 3214 eliminated the language which would have allowed an individual to qualify as an "original source" merely by providing the information to the news media. On October 3,

1986, the Senate passed Senate Amendment 3214.

On October 7, 1986, the House took up S. 1562, as amended by Senate Amendment 3214, and passed it without amendment. On October 27, 1986, the amendments were signed into law.

## III. SHOULD THE 1986 AMENDMENTS APPLY TO THIS CASE

### A. *The Law on the Retroactive Application of Statutes*

As a threshold matter, the court must consider whether the 1986 Amendments apply to this case. There are conflicting considerations on the issue of retroactivity. An in-depth examination of existing law is therefore necessary to resolve this question.

The analysis begins with the case of *Bradley v. Richmond School Board*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). In *Bradley*, the plaintiffs engaged in extensive litigation with the School Board concerning school desegregation. At the time the plaintiffs prevailed, there was no specific provision for attorneys' fees. Nevertheless, the district court granted plaintiffs such fees. While the case was pending on appeal on the issue of attorneys' fees, Congress enacted an attorneys' fees provision which granted a federal court authority to award the prevailing party reasonable attorneys' fees. Thus, the issue before the Supreme Court was whether or not the new legislation applied to the pending case. The Supreme Court unanimously held that,

> a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary.

*Id.* at 711, 94 S.Ct. at 2016.

The Court in *Bradley* proceeded to describe concerns which might constitute an injustice and therefore counsel against retroactive application of a statute. The concerns "center upon (a) the nature and identities of the parties, (b) the nature of their rights, and (c) the nature of the impact of

the change of law upon those rights." *Id.* at 717, 94 S.Ct. at 2019. With respect to the first aspect, the Court stated that school desegregation litigation is different from "mere private cases between individuals." In private party cases, retroactive application is discouraged because individual rights may be affected. In contrast, in cases of great national concern, individual rights are sacrificed for national purposes. In *Bradley*, the new legislation was passed because school desegregation was an issue of "great national concern." *Id.* at 719, 94 S.Ct. at 2020. The Court therefore concluded that the identities of the parties did not militate against the presumption of retroactivity.

On the second concern, relating to the nature of the rights effected by the change, the Court reiterated that the Supreme Court "has refused to apply an intervening change to a pending action where it has concluded that to do so would infringe upon or deprive a person of a right that had matured or become unconditional." *Id.* at 720, 94 S.Ct. at 2020. The Court found that the School Board had no such right in the funds allocated to it by the taxpayers.

Finally, with respect to the third area of concern, "the nature of the impact of the change in law upon existing rights, or ... the possibility that new and unanticipated obligations may be imposed upon a party without notice or an opportunity to be heard," *id.*, the Court held that there was no increased burden imposed on the School Board since the new legislation did not alter the Board's constitutional responsibility to provide a nondiscriminatory education. *Id.* at 721, 94 S.Ct. at 2021. Moreover, the Court found that there was "no change in the substantive obligation of the parties," and there was no indication that the Board, if aware of the new legislation, would have altered its conduct "to render this litigation unnecessary and thereby precluded the incurring of such costs." *Id.* The Court therefore concluded that no manifest injustice results from retroactive application.

The Supreme Court recently had another occasion to examine the retroactive effect of a statute on pending legislation. In 1985, in the case of *Bennett v. New Jersey*, 470 U.S. 632, 105 S.Ct. 1555, 84 L.Ed.2d 572 (1985), the Supreme Court was faced with the question of the retroactive application of amendments to the federal grants program under Title I of the Elementary and Secondary Education Act. The new amendments relaxed the eligibility requirements for local schools to receive Title I funds. The litigation before the Court concerned whether the state of New Jersey had misused funds that it had received under the grant program during the years 1970–72.

The *Bennett* Court held that the presumption of retroactivity under *Bradley* is inappropriate in this context. *Id.* 470 U.S. at 638, 105 S.Ct. at 1559. As the court stated,

> Both the nature of the obligations that arose under the Title I program and *Bradley* itself suggest that changes in substantive requirements for federal grants should not be presumed to operate retroactively. Moreover, practical considerations related to the administration of federal grant programs imply that obligations generally should be determined by reference to the law in effect when the grants were made.

*Id.* at 637–38, 105 S.Ct. at 1558–59.

The Supreme Court reasoned that "Title I, like many other federal grant programs, was 'much in the nature of a contract.'" *Id.* at 638, 105 S.Ct. at 1559. In this case, New Jersey gave assurances when it accepted federal funds that it would spend the funds in accordance with the grant agreement. If funds are misused, the federal government is entitled to recover amounts spent contrary to terms of the grant agreement. Thus, "[a]ssuming that these assurances were not met for the years 1970–1972, ... the state became liable for the improper expenditures; as a correlative, the Federal Government had, before the 1978 Amendments, a pre-existing right of recovery." *Id.* at 639, 105 S.Ct. at 1559. Under such circumstances,

*Bradley* counseled against retroactivity. *See Bradley,* 416 U.S. at 720, 94 S.Ct. at 2020 ("The Court has refused to apply an intervening change to a pending action where is has concluded that to do so would infringe upon or deprive a person of a right that had matured or become unconditional."). The *Bennett* Court added that the limitation announced in *Bradley* "comports with another general rule of statutory interpretation, i.e., that statutes affecting substantive rights and liabilities are presumed to have only prospective effect." *Bennett,* 470 U.S. at 639, 105 S.Ct. at 1559.[4]

Finally the Court in *Bennett* held that practical considerations related to the enforcement of the requirements of grant-in-aid programs also suggest that expenditures must presumptively be evaluated by the law in effect when the grants were made. As the court stated,

> The federal auditors who completed their review of the disputed expenditures in 1975 could scarcely base their findings on the substantive standards adopted in the 1978 Amendments. Similarly, New Jersey when it applied for and received Title I funds for the years 1970–72 had no basis to believe that the propriety of the expenditures would be judged by any standards other than the ones in effect at the time.... Retroactive application of changes in the substantive requirements of a federal grant program would deny both federal auditors and grant recipients fixed, predictable standards for determining if expenditures are proper.

*Id.* 470 U.S. at 640, 105 S.Ct. at 1560.

The Court of Appeals for the First Circuit has also recently analyzed the retroactivity of a statute on a pending case. In 1986, the Court of Appeals examined the retroactivity of an amended jurisdictional provision of the Resource Conservation and Recovery Act ("RCRA"). *Dedham Water Company v. Cumberland Farms Dairy, Inc.,* 805 F.2d 1074 (1st Cir.1986). In *Dedham,* the plaintiff, in seeking to recover expenses incurred in removing hazardous wastes, failed to provide the defendant with 60–days notice prior to filing suit as required by RCRA, thereby depriving the court of subject matter jurisdiction. While the suit was pending, however, Congress amended the provision of RCRA so as to eliminate the 60–day notice requirement. The Court of Appeals held that the amended provision should apply retroactively, and dismissal of the case was reversed.

The Court of Appeals began by reiterating the presumption of retroactivity held in *Bradley,* and followed in a prior First Circuit case, *New England Power Co. v. United States,* 693 F.2d 239, 244 (1st Cir.1982). The Court went on to say, "[w]e see no reason to ignore this rule simply because the case at bar turns on an issue we have held to be jurisdictional in nature." 805 F.2d at 1083.[5] The Court of Appeals explained that on other occasions, the Supreme Court has considered actions that were jurisdictionally infirm when filed, yet has found no jurisdictional defect because Congress has enlarged the district court's jurisdiction while the case was pending. *See, e.g., Andrus v. Charlestone Stone Products Co.,* 436 U.S. 604, 98 S.Ct. 2002, 56 L.Ed.2d 570 (1978) (subject matter jurisdiction existed since Congress removed the amount-in-controversy requirement while case was pending); *United States v. Alabama,* 362 U.S. 602, 80 S.Ct. 924, 4 L.Ed.2d

---

**4.** The *Bennett* Court cited *United States v. Security Industrial Bank,* 459 U.S. 70, 79, 103 S.Ct. 407, 413, 74 L.Ed.2d 235 (1982) wherein the Supreme Court stated:

"[T]he first rule of construction is that legislation must be considered as addressed to the future, not to the past.... The rule has been expressed in varying degrees of strength but always of one import, that a retrospective operation will not be given to a statute which interferes with antecedent rights ... unless such be 'the unequivocal and inflexible import of the terms, and the manifest intention of the legislature." *Union Pacific R. Co. v. Laramie Stock Yards Co.,* 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913) (citations omitted).

**5.** *See also Carlton v. Baww, Inc.,* 751 F.2d 781, 787 n. 6 (5th Cir.1985) ("Absent manifest injustice or congressional intent to the contrary, we generally apply the law as it exists when we make our decision. ... This rule applies as well to changes in the law which affect jurisdiction.").

982 (1960) (jurisdiction properly existed since Civil Rights Act of 1957 provided explicit authority for the court's jurisdiction while case was pending).

The *Dedham* court maintained that in both *Andrus* and *Alabama*, as in the case before it, "Congress subsequently amended the provisions of a statute that it determined to contain a significant jurisdictional gap." 805 F.2d at 1083. The court held, therefore, "that at least when Congress has expanded the jurisdiction of the courts in response to a perceived gap in a statutory jurisdictional scheme, it is proper for us to apply the rule of *New England Power* and *Bradley*." *Id.* at 1084.

The *Dedham* court reiterated that the *Bradley* rule should not apply if it would result in a manifest injustice or if there was statutory direction or legislative history to the contrary. Since Congress did not discuss whether the changes should apply retroactively, the court considered only whether a manifest injustice would result. The court stated,

> As we have established in *New England Power,* ... "manifest injustice" will result when the disappointment of private expectations caused by retroactive application will outweigh the public interest in enforcement of the new rule.

*Id.* at 1084. The court held, however, that in *Dedham,* the balance tipped substantially in favor of retroactive application. *Id.*

### B. *The Law As Applied to This Case*

 According to *Bradley,* a court must start with the presumption that the 1986 amendments to the False Claims Act should apply retroactively to this case, unless doing so would result in a manifest injustice or there is statutory direction or legislative history to the contrary.[6]

---

**6.** Although *Bradley* involved a situation in which the case was pending on appeal before the Court of Appeals when the law was changed, this rule of statutory construction applies equally in cases involving changes in law prior to a district court's determination of an issue. *See Campbell v. United States,* 809 F.2d 563, 569 (9th Cir.1987); *Bell v. New Jersey,* 461 U.S. 773, 793,

### 1. Statutory Direction or Legislative History

The 1986 amendments to the False Claims Act do not, in any provision, address the issue of whether the amendments should be applied retroactively or prospectively. Thus, the language of the statute does not rebut the *Bradley* presumption of retroactive application. *Bradley,* 416 U.S. at 715, 94 S.Ct. at 2018 ("[E]ven where the intervening law does not explicitly recite that it is to be applied to pending cases, it is to be given recognition and effect."). All parties in this case agree on this point.

The court must then consider the legislative history to see if it rebuts the *Bradley* presumption. The *Bradley* presumption of retroactivity may be displaced by "a fair indication that the statute, properly construed, has only prospective effect ..." *Litton Systems, Inc. v. American Telephone & Telegraph Co.,* 746 F.2d 168, 174 (2d Cir.1984); *Campbell v. United States,* 809 F.2d 563, 572 (9th Cir.1987). "But if the legislative history could support either position, the *Bradley* presumption should control." *Campbell,* 809 F.2d at 572 (citing *Bradley,* 416 U.S. at 715–16, 94 S.Ct. at 2018). *See also Eikenberry v. Callahan,* 653 F.2d 632, 633 (D.C.Cir.1981) ("It must be emphasized that it is for Congress to specifically provide for nonretroactivity if that is its intent.").

Plaintiff points to statements by Congress made subsequent to the enactment of the amendments which support a retroactive application. For example, Representative Glickman stated,

> Our reliance on the *Bradley* presumption is made pretty clear by the fact that around the same time as we enacted the False Claims Act Amendments, we also enacted three other related statutes: the Program Fraud Civil Remedies Act of 1986, the Anti–Kickback Enforcement

---

103 S.Ct. 2187, 2198, 76 L.Ed.2d 312 (1983) (White, J., concurring); *United States v. Hill,* 676 F.Supp. 1158, 1166 (N.D.Fla.1987) (court applies 1986 False Claims Act amendments retroactively to a pending case brought by the government, not by a relator under the *qui tam* provisions).

Act of 1986 and a provision of the Division of the Department of Defense Authorization Act of 1986. In each of the statutes, we expressly provided that each would apply only to conduct occurring after the new laws went into effect. Our decision to remain silent in the False Claims Act Amendments, therefore, represents a conscious decision to apply them to false claims predating the amendment.

133 Cong.Rec. H9515 (November 3, 1987). In addition, Representative Berman stated,

As one of the Bill's authors, I specifically raised the question whether it was necessary to include express language regarding retroactive application just to make clear Congress' intent. I concluded that, based on Supreme Court precedent, such express language was not necessary and that language should be added to the bill only if Congress intended it to apply prospectively. The Supreme Court ruled in *Bradley v. Richmond School Board* that statutes are presumed to apply retroactively unless that would create a grave injustice or congressional intent was clearly to the contrary. In fact, *Bradley* expressly said the Court should presume that Congress intended retroactive application by its mere silence on the issue. It was therefore apparent that it was unnecessary to be explicit about retroactivity, as the Courts would infer it from our silence.

*Id.*

Both of the foregoing statements, however, as well as others cited by the plaintiff, merely stand for the proposition that Congress intended the 1986 Amendments to apply to *conduct,* i.e. fraud, pre-dating October 1986, but not necessarily suits previously filed. Indeed, Representative Berman clarified his statement by stating, "it should be noted that these are cases filed after the date of enactment of these amendments, but in which the fraudulent schemes began prior October 27, 1986." *Id.* Thus, despite Congressional awareness of *Bradley,* nothing in the legislative history suggests that Congress even considered the applicability of the new amendment to pending cases.

The court can also look to the basic purposes of the amendment to discern whether or not Congress intended prospective application only. The purpose of the 1986 Amendments is stated in the legislative history. As the Senate Report states,

The Committee's amendments contained in S. 1562 are aimed at correcting restrictive interpretations of the act's liability standard, burden of proof, *qui tam* jurisdiction and other provisions in order to make the False Claims Act a more effective weapon against Government Fraud.

S.Rep. 99–345, 99th Cong., at 4. Indeed, Congress was responding to "several restrictive court interpretations of the act ... which tend[ed] to thwart the effectiveness of the statute." *Id.* In addition, the amendments attempt to increase the participation by the private citizenry in uncovering fraud. *Id.* at 8.

The Bank of Boston argues that giving the *qui tam* provisions of the 1986 Amendments retroactive effect will not further the purpose of encouraging more informers to come forward because LaValley and others similarly situated have already initiated their suits. Thus, the Bank argues that Congress intended only prospective effect.

The court, however, disagrees. While it is true that LaValley has already come forward and filed this suit, another restrictive interpretation by a court of the old *qui tam* provisions might discourage other prospective *qui tam* plaintiffs from coming forward. In any event, retroactive application would not discourage LaValley from pursuing his suit.

Moreover, the legislative history must be viewed as a whole. When this is done, the presumption of retroactivity is not displaced by indications of legislative intent to the contrary.

### 2. Manifest Injustice

■ *Bradley* specifically states that the presumption of retroactivity should not be followed if to do so would result in a manifest injustice. 416 U.S. at 711, 94 S.Ct. at 2016. *Bradley* sets out three factors by which the presence or absence of manifest injustice may be evaluated. No one factor

is entirely dispositive. Rather the factors are part of a balancing which serves to focus the underlying concern in applying the law retroactively, or as the First Circuit put it, to analyze whether the "disappointment of private expectations caused by retroactive application will outweigh the public interest in enforcement of the new rule." *Dedham*, 805 F.2d at 1084.

### a) Nature of the Parties

■ The first *Bradley* factor focuses on the nature of the parties involved. *Bradley*, 416 U.S. at 717–18, 94 S.Ct. at 2019. This factor weighs heavily in favor of retroactivity where the statute manifests an important public policy. As the *Bradley* court stated,

> "In mere private cases between individuals, the Court will and ought to struggle hard against a construction which will, by retrospective operation, affect the rights of the parties, but in great national concerns, where individual rights ... are sacrificed for national purposes, ... the Court must decide according to existing laws."

416 U.S. at 717, 94 S.Ct. at 2019 (quoting *United States v. The Schooner Peggy*, 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49 (1801)). *See also United States v. Marengo County Commission*, 731 F.2d 1546, 1554 (11th Cir.1984) ("Although it may not be imperative to apply new congressional enactments to preexisting disputes over private issues, when the new statute manifests important public policy the Courts must respect that policy and apply it.").

The plaintiff in this case argues that the amendments to the False Claims Act evidence a clear effort by Congress to address a paramount public concern. Plaintiff cites various passages from the legislative history in which Congress describes billions of public funds lost to fraud, and the need to uncover such fraud. LaValley also relies on a Florida district court case, *United States v. Hill*, 676 F.Supp. 1158 (N.D.Fla. 1987), in which the court, after performing a *Bradley* analysis, held that the 1986 Amendments should apply retroactively. Although the *Bradley* analysis in *Hill* is quite useful, the case did not involve the *qui tam* provisions since the suit was an action by the government. In any event, *Hill* held that the 1986 Amendments were a matter of national concern since they involved the recovery of public funds. *Id.* at 1169. This concern is equally reflected in the changes to the *qui tam* provisions which encourage more participation by private citizens in uncovering fraud. The Bank has not presented any arguments to suggest that the nature of the parties in this case creates a manifest injustice when the amendments are applied retroactively. Thus, the first prong of the *Bradley* test does not indicate a manifest injustice and the presumption of retroactivity is, to this point, maintained.

### b) Nature of the Rights Affected by Retroactive Application

In explaining the second *Bradley* factor, the nature of the rights affected by retrospective construction, the Court indicated that a retroactive application of a new enactment might yield a manifest injustice where retroactivity would "infringe upon or deprive a person of a right that had matured or become unconditional." 416 U.S. at 720, 94 S.Ct. at 2020.

The Bank of Boston contends that it has a vested right that had matured, and therefore retroactivity results in a manifest injustice. The Bank relies on *United States ex rel. Henry Boisvert v. F.M.C. Corp.*, No. C–86–20163–WAI (N.D.Cal. Sept. 9, 1987), in which the court concluded that the *qui tam* amendments should not apply retroactively because the defendant had a vested right to present a defense of knowledge on the part of the government. Thus, it held that it would be manifestly unjust to apply the new *qui tam* provisions. *See also United States, ex rel. Hyatt v. Northrup Corp.*, No. 86–6437–KN, slip op., (C.D.Cal. Mar. 31, 1988) (relying on *Boisvert*, court concluded *qui tam* amendments do not apply retroactively).

This court, however, respectfully disagrees with the reasoning in *Boisvert*. First, the decision cites *Bennett v. New*

*Jersey* to demonstrate that the holding in *Bradley* has been severely narrowed. This, however, is not correct. *Bennett* merely stands for the proposition that when contract rights had already matured and were vested, as in the case of a federal grant program, manifest injustice would result from retroactive application of new standards. Indeed, this is totally consistent with the second prong of the *Bradley* manifest injustice test.

*Boisvert* goes on to assert that the defendant had a vested right in its defense of government knowledge, citing *Winfree v. Northern Pacific Railway Co.*, 227 U.S. 296, 33 S.Ct. 273, 57 L.Ed. 518 (1913) in which the Court held that a new act which eliminated a material defense to a wrongful death suit should not apply retroactively. In *Winfree*, the Court refused to apply a 1908 federal act which "provided that every common carrier engaged in interstate commerce shall be liable in damages for injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of the carrier." 173 F. 65, 66 (9th Cir.1909). The Court found that "it is a statute which permits recovery, in cases where recovery could not be had before, and takes from the defendant defenses which formerly were available, defenses which in this instance existed at the time when the contract of service was entered into and at the time when the accident occurred." 227 U.S. at 302, 33 S.Ct. at 274.

Application of *Winfree* to this case, however, is inappropriate. Unlike the defendant in *Winfree*, whose conduct was tailored to defenses available to him at the time of the accident, the defendant here did not tailor its substantive conduct in reliance on a defense. As LaValley correctly argues, the change in the *qui tam* provisions in the 1986 Amendments do not affect the relationship between the Relator, LaValley, and the Defendant, the Bank. Rather, the changes relate entirely to the relationship between two possible plaintiffs, the United States and the Relator who seeks to act for it. The defendant's liabilities and substantive defenses remain the same. The Bank always had an unaltered obligation not to defraud the FmHA. Thus, the Bank's defense of government knowledge is not a matured vested right within the meaning of *Bennett*. Rather, this case is analogous to *Bradley*, in which the Court found there "was no change in the substantive obligations of the parties," 416 U.S. at 721, 94 S.Ct. at 2021, and thus there is no manifest injustice resulting from retroactive application of the 1986 Amendments.

This conclusion is not qualified by the Bank's contention at oral argument that it did act in reliance on the old provisions when it forwarded to the FmHA, Beinhocker's letter of February 13, 1984. The Bank claims that it intentionally apprised the government of the allegations in the letter so as to cooperate fully with the government and estop a private party from later asserting standing to sue. By passing the letter along to the government, the Bank hoped to raise the jurisdictional bar that prohibits suits based on evidence or information in the possession of the government. Thus, the Bank contends that it had a vested, or matured right in its defense of government knowledge.

This argument is not, however, persuasive. First, the letter by Beinhocker contained allegations, not evidence. Standing alone, such allegations would be insufficient to form the basis of a suit against the Bank for misrepresentations made in connection with the federal loan guarantee. Indeed, the Department of Justice, in its Amicus Brief, asserts that with the Beinhocker Letter *and* the Trustee's Complaint, the government did not, in fact, have enough information about the central allegations of fraud in this case to allow it to investigate, and thereby raise the jurisdictional bar to LaValley's suit. Supp. Brief of the United States as Amicus Curiae at 26. Moreover, the Bank was not prejudiced in any manner by forwarding the letter to the FmHA since, in this case, the government chose not to prosecute the Bank.

This conclusion is reinforced by recognition that the Court of Appeals for the First Circuit declined to accept the defendant's

jurisdictional defense as a matured right in *Dedham. See,* 805 F.2d at 1083. There, a 60 day notice requirement in the old law could be used as a jurisdictional bar, and thus as a defense by the defendant, if not met. When the law changed, and eliminated the requirement, the court held the new law should apply retroactively. Implicit in this decision was a recognition that the jurisdictional defense did not constitute a matured or antecedent right for the purposes of manifest injustice analysis.

#### c) New and Unanticipated Obligations

The third *Bradley* factor requires a consideration of whether injustice will result from "new and unanticipated obligations ... imposed *on a party* without notice or an opportunity to be heard." *Bradley,* 416 U.S. at 721, 94 S.Ct. at 2021 (emphasis added). "This inquiry focuses on whether the new statutory obligation, if known, would have caused the defendant to alter its conduct." *Campbell,* 809 F.2d at 576. As previously stated, the Bank has not persuaded the court that it would have altered its conduct with regard to the loan or the application to the FmHA if it knew the new amendments were applicable. Moreover, although the U.S. Department of Justice argues in an Amicus Brief to this court that its decision not to intervene in this case may have been different had it known the new amendments were to apply, consideration of the conduct of a *non*-party does not appear to be relevant to the *Bradley* analysis. *See Bradley,* 416 U.S. at 721, 94 S.Ct. at 2021. Thus, viewing only the factors discussed in *Bradley,* the application of the 1986 Amendments to this case would not result in a manifest injustice.

#### 3. Additional Arguments Raised by the Defendant

The Bank, however, raises an additional argument against retroactive application. This argument involves both the construction of applicable law, and a ground for finding manifest injustice.

The Bank relies on *United States v. Kimberlin,* 776 F.2d 1344 (7th Cir.) *cert. denied* 476 U.S. 1142, 106 S.Ct. 2251, 90 L.Ed.2d 697 (1985), for the proposition that courts do not favor interpretations of jurisdictional statutes that give them retroactive effect. In *Kimberlin,* the question was whether an amendment to Fed.R. Crim.P. 35(b), which provided that a court had "reasonable time" to reduce the sentence of a convicted felon, rather than the previously prescribed 120 days, applied retroactively in a case where the court did not act within 120 days. Rule 35 defined a jurisdictional limit which removed jurisdiction from the court when 120 days had elapsed. 776 F.2d at 1346. Despite the fact that no parties could claim that they relied on the old rule to their detriment, the court declined to apply the new provision retroactively. As the Court of Appeals for the Seventh Circuit stated,

> [a]n expansion of the court's jurisdiction *can* revive a claim, ... but the outcome is sufficiently unusual that the legislature should say so pretty clearly before a court will conclude that the statute produces this effect.

*Id.* at 1347 (citations omitted).

Moreover, the Bank argues that courts will only apply jurisdictional statutes retroactively when the statutes are remedial and are designed to correct a "lacuna" in the law. For example, courts interpreting the retroactivity of the jurisdictional provisions of the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602–11 ("FSIA"), have held that such provisions should not be applied retroactively to pending cases since Congress did not intend them to be remedial, or to correct a "lacuna". *See Corporacion Venezolana de Fomento v. Vintero Sales,* 629 F.2d 786, 791 (2d Cir.1980); *Jackson v. People's Republic of China,* 794 F.2d 1490, 1497 (11th Cir.1986).[7]

Indeed, the Bank argues that even *Dedham,* upon which LaValley relies, holds that the Supreme Court precedents uphold

---

7. *See also* cases discussing diversity jurisdiction —where jurisdiction must be decided based on the facts which existed on the date the suit was filed. *Smith v. Sperling,* 354 U.S. 91, n. 1, 77 S.Ct. 1112, 1 L.Ed.2d 1205 (1957); *Topp v. Compair, Inc.,* 814 F.2d 830, 832 (1st Cir.1987).

the rule that jurisdictional changes should be retroactive when the change is remedial and curative, "in response to a perceived gap in a statutory jurisdictional scheme." 805 F.2d at 1083. Thus, the Bank argues that the 1986 Amendments, like the jurisdictional provisions of the FSIA, and the jurisdictional provision cited in *Kimberlin*, should not apply retroactively because they are not remedial in nature.

This court finds, however, that the cases cited by the Bank are not controlling and are distinguishable. Moreover, Congress intended the 1986 Amendments to be remedial in nature.

First, to the extent the Court of Appeals for the Seventh Circuit maintains in *Kimberlin* that jurisdictional statutes should not apply retroactively, the Court of Appeals for the First Circuit expressly disagrees. As the Court of Appeals for the First Circuit stated in *Dedham*, "[w]e see no reason to ignore [the *Bradley* presumption of retroactivity] simply because the case at bar turns on an issue we have held to be jurisdictional in nature." 805 F.2d at 1083. This court must take its direction from the Court of Appeals for the First Circuit.

Second, *Kimberlin* is factually distinguishable from the case at bar. The opinion in *Kimberlin* suggests that although the amendment at issue did not fit neatly into the *Bradley* analysis, a manifest injustice would have resulted from retroactive application. As the Court stated,

> Our case does not fit readily into the category of matured rights; to apply the vested rights doctrine mechanically would be a mistake, because no private party acquired entitlements under or acted in reliance on a time limit. Yet we think that the nature of the new rule—which expands a time limit even though not to the detriment of any private party—nonetheless calls for prospective application in the absence of any contrary indication in its language or genesis (and there is none).

776 F.2d at 1347. The court went on to explain that the time limit established by the Rule "mediates between competing aims: the time must be long enough to allow the judge to reduce a sentence if he is so disposed, and it must be short enough that the judge's power does not duplicate the discretion of the Parole Commission." *Id.* The purpose of the amended Rule was to give a judge "a little extra time" if necessary to make its decision. The court found, however, that "the purpose of this small though elastic extension in the rule would not be served by remanding to allow a third judge in 1985 to revise Kimberlin's sentence in response to a motion filed in 1983. Kimberlin wants the court to look at things that happened well after he was sentenced back in 1981."[8] *Id.* at 1348. The court therefore concluded that,

> the Advisory Committee's conclusion that a "reasonable" amount of time after the 120–day period does not trench unduly on the powers of parole officials does not imply that a retroactive application of the rule, which would allow the reopening of motions filed years ago, also is appropriate.

*Id.* Thus, unlike the conclusion drawn from a *Bradley* analysis in this case, retroactive application of the statute in *Kimberlin* would have resulted in a manifest injustice.

Similarly, application of the jurisdictional provision of the FSIA would have constituted a manifest injustice under the *Bradley* test. Although not analyzing it in the *Bradley* context, the district court in *Jackson* found that application of the FSIA to the pending case would interfere with the defendant's legitimate expectations based upon the existing law at the times relevant to the controversy. 596 F.Supp. 386, 388 (N.D.Ala.1984). Specifically, the court held that "restrictive immunity," as codified in the FSIA was not the law at the time of the events in question. *Id.* Thus,

> China [the defendant] relied on the well-founded expectation that the then extant,

---

**8.** The decision would require a third judge since Kimberlin claimed that the first two judges were biased against him.

almost universal doctrine of absolute sovereign immunity governed all interactions between her and the United States and the citizens of the two respective countries. Concomitantly, China had no apprehension of being haled into a court in the United States to answer for any default of the [pending] issue.

*Id.* [9]

In addition, the Court of Appeals for the Second Circuit explained in *Corporacion Venezolana de Fomento* that the FSIA "represented Congress' first codification of principles of sovereign immunity law." 629 F.2d at 791. The passage of the FSIA could hardly "be said to have remedied a 'lacuna'." *Id.*

Thus, although the Bank points to several cases in which courts have refused to apply jurisdictional statutes retroactively, such cases are distinguishable from the case at bar. Unlike this case, the courts in those cases actually found that a manifest injustice would result from retroactive application.

Moreover, LaValley persuasively argues that the *qui tam* amendments are remedial and should be given retroactive effect. Unlike the FSIA, the amendments to the False Claims Act were not the first codification of an area of law. Rather, as the Senate report contends, the amendments were necessary to correct "several restrictive court interpretations ... which tend[ed] to thwart the effectiveness of the statute." S.Rep. 345 at 4. The Senate report specifically mentions that under the old law "courts have since adopted a strict interpretation of the jurisdictional bar as precluding any *qui tam* suit based on information in the government's possession, despite the source." *Id.* at 12. The new amendments sought to correct what appeared to be an unexplained deletion in the 1943 Amendments of an exception for original sources. *Id.* In addition, the Senate stated that the amendments were "aimed at correcting restrictive interpretations of the act's liability standard, burden of proof,

*qui tam* jurisdictional amendments and other provisions in order to make the False Claims Act a more effective weapon against government fraud." S.Rep. 345 at 4.

This court is satisfied that the 1986 Amendments are remedial in nature, and not designed to affect substantive rights. As indicated earlier, the Bank of Boston always had an unaltered obligation not to defraud the FmHA. The 1986 Amendments only relate to the means for enforcement of that obligation.

### 4. Additional Argument Raised by the United States

The question remains, however, whether the impossibility of the application of some of the 1986 *qui tam* provisions renders retroactive application in this case unjust. In its Amicus Brief, the Department of Justice argues that, although other provisions of the 1986 Amendments are remedial, the *qui tam* jurisdictional amendments are not. The government contends that Congress established a new procedure in the *qui tam* amendments that would make retroactive application impossible. Thus, the government argues that the new procedures are not remedial and application would result in manifest injustice. Supp. Brief of the United States as Amicus Curiae at 20. Indeed, the court acknowledges that *Bennett* recognized the impracticality of retroactive application of grant standards as an additional reason for applying the old statute. 470 U.S. at 640, 105 S.Ct. at 1560.

Under the new provisions, a relator is required to present his suit to the government, *in camera,* 60 days prior to filing and giving notice to defendant. This was obviously not done in this case. However, the legislative history suggests that the purpose for this provision was to satisfy a concern of the Justice Department "that *qui tam* complaints filed in open court might tip off targets of ongoing criminal investigations ..." S.Rep. at 16. Thus, despite the Bank's argument, it was not to

---

**9.** In addition, the court found that the actual language of the Act "is expressly prospective."

596 F.Supp. at 388.

provide protection for the defendant. In any event, in this case a manifest injustice will not result if prior notice to the government is not required. Indeed, it seems inconsistent for the government to argue, as it does, that all provisions but the *qui tam* provisions should apply retroactively, rather than arguing that all provisions, except the *in camera* review should apply retroactively. The existence of the *in camera* requirement does not overcome the presumption of retroactivity. Thus, the 1986 *qui tam* amendments should apply retroactively to this case under the reasoning in *Bradley* and its progeny.[10]

## IV. APPLICATION OF THE NEW AMENDMENTS TO THE CASE

Under the 1986 Amendments, a court is without jurisdiction in a False Claims action if the action is "based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the actions is an original source of the information." 31 U.S.C. § 3730(e)(4)(A). Thus, this court must determine whether: (1) there has been a public disclosure within the meaning of the statute; (2) if so, whether the relator "based" his suit on the public disclosure; and (3) if so, whether the relator is "an original source of the information."

### A. *Public Disclosure*

The Bank argues that the Trustee's Complaint was a public disclosure of the allegations and transactions in this case. LaValley disagrees, claiming that the Trustee's Complaint was a "proceeding" rather than

a "hearing". LaValley cites legislative history which suggests that the word "proceeding" was specifically dropped from the amendments before enacted. On the other hand, the Bank argues for an expansive reading of "public disclosure" since even statements by the news media would constitute a "public disclosure" within the meaning of the Act.

The only case to discuss the meaning of "hearing" since the passage of the 1986 Amendments is *United States ex rel. Houck v. Folding Canton Administration Committee*, No. 87–C–1253, slip op. (N.D. Ill. Jan. 20, 1988) [1988 WL 74829]. In *Houck*, the court stated that the False Claims Act "does not permit *qui tam* plaintiffs to bring actions based solely upon transactions publicly disclosed in, among other forums, civil proceedings and hearings." *Id.* at 8. LaValley contends, however, that the court's inclusion of the word "proceedings" may have been mere dicta since the public disclosure in question could have been a full trial, or hearing in a multi-district litigation suit in which a stipulated settlement was agreed upon. LaValley argues that unlike a hearing, such as the one described in *Houck*, a filing of a Trustee Complaint is merely a "proceeding" in which the evidentiary basis for the allegations is not disclosed. Thus, LaValley contends that a public proceeding is less likely to lead to a parasitical action. This court assumes without deciding, however, that "proceeding" means the same as a "hearing," and thus, a public disclosure has occurred.

### B. *"Based on" the Trustee Complaint*

■ Even if this court regards the Trustee Complaint as a public disclosure, LaValley persuasively argues that his suit was not "based upon" the Trustee's Complaint.

---

**10.** This holding is a narrow one, considering only the parties and issues before this court. This court, therefore, takes no position on the question of retroactivity in a case in which the government intervenes and other provisions of the new amendments are applicable. For example, under the old *qui tam* provisions, if the government intervened, relators had no statutory right to participate in settlement discussions, discovery, or decisions on dismissal. In

contrast, under the new provisions, the relator can still have "unrestrictive participation" in the suit, 31 U.S.C. § 3730(C)(1), unless the district court "imposes limitations on the participation." § 3730(c)(3). Thus, even though this court holds that the *qui tam* amendments have retroactive effect in this case, the outcome could properly be different in another case, involving other parties and other provisions of the 1986 Amendments.

Instead, the court finds that this suit is based upon the knowledge developed independently by the three original relators prior to the appointment of the Trustee in the Elmendorf bankruptcy, and upon the subsequent discovery of a key witness not revealed in any public disclosure.

As the record indicates, in the summer of 1983, Beinhocker and Watts first met with FmHA officials in Washington to tell them that the Bank of Boston was not protecting the FMHA's interest in the ninety % guaranty of Elmendorf's debt. In January, 1984, Beinhocker and Watts filed an involuntary petition in bankruptcy against Elmendorf and its parent, Stranway Corporation. Shortly thereafter, Beinhocker and Watts formed a joint venture with LaValley in an attempt to purchase FmHA's position in Elmendorf. *See* Affidavit of Beinhocker, ¶ 9. Beinhocker and Watts had been carefully monitoring the financial condition of Elmendorf and, when the joint venture was formed with LaValley, LaValley was apprised of the information Beinhocker and Watts had developed.

In June 1984, the appointment of a Bankruptcy Trustee was sought when the original relators became aware that Elmendorf planned to close the mill. *Id.* at ¶ 10. The Trustee was informed of the joint venture's information and was provided with documents relevant to Elmendorf's unstable financial conditions and the Bank's misrepresentations to the FmHA. In August 1984, the Trustee filed his Complaint. The information contained in the Trustee's Complaint was obtained by the Trustee, Joseph Ryan, from Beinhocker and Watts. *See* Affidavit of Andrea Maislen at p. 2, para. 14. Messrs. Beinhocker and Watts did so on behalf of LaValley and ELV, their joint venture. Affidavit of Beinhocker, ¶ 9.

In early 1985, Beinhocker, Watts and LaValley became aware of Eugene Demchenko, who had worked on the Elmendorf Bankruptcy while employed with the Bank of Boston. Demchenko provided the three with highly credible information, later confirmed by documents from the files of the Bank obtained in discovery. In June 1985, Beinhocker, Watts and LaValley filed this action against the Bank of Boston on behalf of the United States.

Thus, the information and knowledge upon which this action is based did not originate from the Bankruptcy Trustee's Complaint. Rather, the source of this information was the ongoing monitoring and investigation conducted by Beinhocker, Watts and LaValley. Furthermore, Beinhocker, Watts and LaValley discovered the key witness in this action, Eugene Demchenko. Prior to the commencement of this action, the government knew nothing about the witness, Demchenko, and nothing about the evidence with which he provided Beinhocker, Watts and LaValley. It was therefore not information that was contained in any public disclosure.

### C. *Original Source*

Finally, the Bank of Boston contends that LaValley is not an original source of the information in the Trustee's Complaint. Rather, the Bank claims that if any of the three original relators are original sources, only Beinhocker and Watts would qualify. In response, LaValley contends that the joint venture formed by Beinhocker, Watts and LaValley provided the information to the Trustee, and discovered the key witness, Demchenko. Thus, LaValley argues that the joint venture is an original source, and each of its members qualify as an original source.

In light of the court's holding that the complaint in this case was not "based upon a public disclosure," this court need not determine whether the relator, LaValley, was an original source of information disclosed publicly. Section 3730(e)(4)(A) only requires that the relator be an original source of the information in a public disclosure if the court finds that the relator's action was based upon that public disclosure. This action is not, therefore, barred by the jurisdictional bar of the False Claims Act, 31 U.S.C. § 3730(e)(4)(A).

## V. ORDER

For the reasons stated above, the *qui tam* provisions of the 1986 amendments to

the False Claims Act, apply retroactively to this case. Under the 1986 Amendments, this court has jurisdiction over LaValley's False Claims action. The Bank of Boston's motion to dismiss is therefore hereby DE-NIED. As previously ordered, discovery shall be completed by July 15, 1989.